# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 15-354 consolidated with 15-838 & 15-1113

**RON WARREN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF DEREK HEBERT**

**VERSUS**

**SHELTER MUTUAL INSURANCE COMPANY, ET AL.**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2006-385
HONORABLE DAVID KENT SAVOIE, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Jimmie C. Peters, and John E. Conery, Judges.

**CONERY, J., concurs in part, dissents in part and assigns reasons.**

**AFFIRMED.**

Anthony M. Fazzio
4906 Ambassador Caffery – Suite 1000
Lafayette, LA 70508
Telephone: (337) 406-1122
COUNSEL FOR:
    Plaintiff/Appellee - Ron Warren, Individually and on Behalf of the Estate of Derek Hebert

Barton W. Bernard
117 Caillouet Place
Lafayette, LA 70501
Telephone: (337) 989-2278
COUNSEL FOR:
    Plaintiff/Appellee - Ron Warren, Individually and on Behalf of the Estate of Derek Hebert

**Steven Broussard**
**Steven R. Hart**
**Aaron Broussard**
**Broussard & Hart, LLC**
**1301 Common Street**
**Lake Charles, LA 70601**
**Telephone: (337) 439-2450**
**COUNSEL FOR:**
   **Plaintiff/Appellee - Ron Warren, Individually and on Behalf of the Estate of Derek Hebert**

**David R. Frohn**
**Manion Gaynor & Manning LLP**
**2201 Lake Street - Suite 106**
**Lake Charles, LA 70601**
**Telephone: (337) 419-1929**
**COUNSEL FOR:**
   **Defendant/Appellant - Teleflex, Inc.**

**H. Alston Johnson, III**
**Phelps Dunbar LLP**
**II City Plaza**
**400 Convention Street - Suite 1100**
**Baton Rouge, LA 70802**
**Telephone: (225) 346-0285**
**COUNSEL FOR:**
   **Defendant/Appellant - Teleflex, Inc.**

**Jeffery D. Fruge**
**The Thibodeaux Law Firm, LLC**
**P. O. Box 2090**
**Lake Charles, LA 70602-2090**
**Telephone: (337) 433-5523**
**COUNSEL FOR:**
   **Defendant/Appellant - Teleflex, Inc.**

**Rudie R. Soileau, Jr.**
**Lundy, Lundy, Soileau & South, LLP**
**P. O. Box 3010**
**Lake Charles, LA 70602**
**Telephone: (337) 439-0707**
**COUNSEL FOR:**
   **Defendant/Appellee - Glen D. Vamvoras**

**Richard D. Chappuis, Jr.**
**Voorhies & Labbe**
**P. O. Box 3527**
**Lafayette, LA 70502**
**Telephone: (337) 232-9700**
**COUNSEL FOR:**
     **Defendant/Appellee - Bowtie Marina**

**Maurice L. Tynes**
**Maurice L. Tynes & Associates**
**4839 Ihles Road**
**Lake Charles, LA 70605**
**Telephone: (337) 479-1173**
**COUNSEL FOR:**
     **Defendant/Appellee - Daniel Vamvoras**

**Vernon Ed McGuire, III**
**Plauche', Smith & Nieset**
**P. O. Drawer 1705**
**Lake Charles, LA 70602**
**Telephone: (337) 436-0522**
**COUNSEL FOR:**
     **Defendants/Appellees - Richard Gandy, Michael Torres, Progressive**
     **Security Insurance Company, and Logan Gandy**

**James Ryan, III**
**James Ryan III & Associates, LLC**
**201 St. Charles Avenue – Suite 2420**
**New Orleans, LA 70170**
**Telephone: (504) 599-5990**
**COUNSEL FOR:**
     **Defendant/Appellant – Harold Dyke d/b/a Harold's Marine**

**Joshua S. Force**
**Kevin M. McGlone**
**Sher Garner Cahill Richter Klein & Hilbert, L.L.C.**
**909 Poydras Street – Suite 2800**
**New Orleans, LA 70112**
**Telephone: (504) 299-2100**
**COUNSEL FOR OTHER:**
     **National Marine Manufacturers Association**

**Francis P. Manchisi**
**Wilson Elser Moskowitz Edelman & Dicker LLP**
**1133 Westchester Avenue**
**White Plains, NY 10604**
**Telephone: (914) 872-7000**
**COUNSEL FOR OTHER:**
     **National Marine Manufacturers Association**

**Iain L. Kennedy**
**Shook, Hardy & Bacon L.L.P.**
**Miami Center - Suite 3200**
**201 S. Biscayne Boulevard**
**Miami, FL 33131-4332**
**Telephone:  (305) 358-5171**
**COUNSEL FOR OTHER:**
     **Louisiana Association of Business and Industry**

**Mark A. Behrens**
**Cary Silverman**
**Shook, Hardy & Bacon L.L.P.**
**1155 F Street NW – Suite 200**
**Washington, DC 20004**
**Telephone:  (202) 783-8400**
**COUNSEL FOR OTHER:**
     **Louisiana Association of Business and Industry**

**THIBODEAUX, Chief Judge.**

Plaintiff-appellee Ron Warren, individually and on behalf of the Estate of Derrek Hebert, filed a petition for damages seeking to recover for the wrongful death of his son, Derek Hebert, in a recreational boating accident under general maritime law and products liability. The defendant, Teleflex, Inc. (Teleflex), was found liable and appeals various judgments casting it for compensatory damages of $125,000, punitive damages of $23,000,000, and legal interest. Mr. Warren also appeals a judgment on judicial interest. There are three consolidated appeals. For the reasons expressed below, we affirm the judgments of the trial court on all issues.

I.

## ISSUES

We must decide:

(1) whether the trial court erred in granting directed verdicts to defendants Glen and Daniel Vamvoras in the first trial;

(2) whether the trial court abused its discretion in granting the plaintiff a new trial;

(3) whether the trial court erred in failing to instruct the jury on the duties of a component part manufacturer;

(4) whether the trial court erred in failing to bifurcate the adjudication of compensatory and punitive damages in the second trial;

(5) whether the jury abused its discretion or manifestly erred in awarding punitive damages in the second trial;

(6) whether the jury abused its discretion in awarding excessive punitive damages;

(7) whether the trial court erred in awarding prejudgment interest on compensatory damages; and

(8)     whether the trial court erred in denying prejudgment interest on punitive damages.

II.

**FACTS AND PROCEDURAL HISTORY**

This accident occurred on May 7, 2005, on the navigable inland waters of Louisiana, between the Lake Charles Country Club and the home of Lake Charles attorney Glen Vamvoras, located on a former channel of the Calcasieu River.  Derek Hebert was a passenger in a Champion boat owned by Glen Vamvoras and operated by his son Daniel Vamvoras.  The Champion's steering failed while the boat was on plane.  The boat went into a spin, throwing Derek Hebert overboard.  The boat's propeller struck him nineteen times, causing his death.  His parents brought survival and wrongful death claims and sought punitive damages against several defendants.

The defendants included Glen and Daniel Vamvoras, as well as drivers of another boat which collided with the Vamvoras boat after Derek was ejected, various marinas, insurers, and three manufacturers.  The mother's claim was settled after mediation, and her suit was dismissed.  The father, Ron Warren, proceeded with his wrongful death and survival action under general maritime law, seeking compensatory damages, punitive damages, and judicial interest thereon.  Litigation continued for approximately nine years.  By the time of trial, the remaining defendants were Glen Vamvoras, Daniel Vamvoras, and Teleflex.

The Louisiana Department of Wildlife & Fisheries (Wildlife & Fisheries) investigated the accident and determined that the boat, which had been purchased pre-owned by Glen Vamvoras, lost its steering because of a hydraulic oil/fluid leak in one of the steering system's hydraulic lines at a hose/nut or

2

coupling assembly. Teleflex manufactured and supplied the boat's hydraulic steering system, but one of the original Teleflex hoses had been replaced by persons unknown with a non-Teleflex hydraulic hose. The remaining claim against Teleflex at the time of trial was not for construction or design defects. The claim asserted is that the steering system is defective because it contains an inherent danger unknown to users, and Teleflex breached its duty to warn unsuspecting users of a dangerous risk in using its product.

As a result of the proceedings below, including two trials and various post-trial motions and hearings, there are three consolidated appeals pending before this court under docket numbers 15-354, 15-838, and 15-1113.

The trial court granted directed verdicts to Glen Vamvoras and Daniel Vamvoras, and to Bowtie Marina, one of the marina defendants, dismissing them from the suit in the first jury trial. These dismissals left Teleflex as the only defendant on the jury verdict form. The jury found in favor of Teleflex, and the trial court signed a September 30, 2014 judgment dismissing Mr. Warren's claims against Teleflex. However, the trial court subsequently granted Mr. Warren's motion for new trial based on prejudicial error during the first trial.

At the conclusion of the second trial, the jury rendered a verdict in favor of Mr. Warren and against Teleflex, awarding compensatory damages of $125,000 and punitive damages of $23,000,000. Based on the jury's verdict, the trial court entered a December 29, 2014 judgment in favor of Mr. Warren awarding the above amounts. Although neither party had introduced evidence on the issue of judicial interest, and that issue was not submitted to the jury, the trial court also awarded prejudgment interest on compensatory damages from the date of judicial demand.

3

Both Mr. Warren and Teleflex filed post-trial motions after the second trial. Teleflex sought a JNOV, or in the alternative a new trial or a remittitur on punitive damages. Mr. Warren sought a JNOV confirming the award of interest on compensatory damages and sought prejudgment interest on punitive damages from the date of the accident or, alternatively, from the date of judicial demand.

While the post-trial motions on the second trial were pending, Teleflex appealed from the directed verdicts in the first trial. Teleflex's first appeal is docketed in this court as appeal No. 15-354.

Following a hearing on June 17, 2015, the trial court entered two judgments. One judgment denied Teleflex's post-trial motions for JNOV or new trial or remittitur on the punitive damage award. Another judgment granted Mr. Warren's motion for JNOV as to legal interest on compensatory damages but denied his JNOV as to interest on punitive damages.

Mr. Warren filed a devolutive appeal from the December 29, 2014 judgment and the June 17, 2015 judgment, regarding legal interest on punitive damages. His appeal is docketed in this court as No. 15-838.

Teleflex filed a suspensive appeal from the December 29, 2014 judgment awarding compensatory and punitive damages to Mr. Warren, and from the June 17, 2015 judgment denying its post-trial motions for JNOV or new trial or remittitur on punitive damages. Teleflex's appeal from the second trial is docketed in this court as No. 15-1113.

We have consolidated Teleflex's appeal No. 15-354 from the directed verdicts in the first trial with Mr. Warren's devolutive appeal No. 15-838 on legal interest and with Teleflex's suspensive appeal No. 15-1113 on various issues, including the granting of the new trial to the plaintiff and four assigned errors

4

arising from the second trial. We will address all issues raised in the three consolidated appeals, by docket number. However, because Teleflex's appeal No. 15-1113 appeals two judgments and covers five issues, we will address it second, and we will address Mr. Warren's appeal No. 15-838 last. We begin with Teleflex's appeal No. 15-354.

III.

## LAW AND DISCUSSION

### APPEAL NUMBER 15-354

**Directed Verdicts**

Teleflex contends that the trial court erred in granting directed verdicts in favor of Glen and Daniel Vamvoras in the first trial, arguing the Vamvorases either knew or should have known of the unreasonable risk of harm associated with a loss of fluid in the hydraulic system. We find that the trial court properly granted the directed verdicts.

On appeal, "*legal* sufficiency of the evidence challenges, such as those presented by . . . motions for directed verdict . . . are subject to the *de novo* standard of review that is used for all legal issues." *Hall v. Folger Coffee Co.*, 03-1734, p. 10 (La. 4/14/04), 874 So.2d 90, 99. "[T]he applicable standard of review on a motion for directed verdict is whether the evidence in the record is such that a reasonable person could not reach a verdict to the contrary." *Richard v. Artigue*, 11-1471, p. 4 (La.App. 3 Cir. 4/4/12), 87 So.3d 997, 1001.

In order to find Glen or Daniel at fault for Derek Hebert's death, Teleflex must have satisfied the requirements of La.Civ.Code art. 2317.1, which states in pertinent part:

5

The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.

Further, this court has maintained that it is proper to grant a motion for directed verdict where there is no evidence that the defendant knew or should have known that a product was defective due to inadequate warnings. *See LeBleu v. Homelite Div. of Textron, Inc.*, 509 So.2d 563 (La.App. 3 Cir. 1987) (affirming directed verdict for non-manufacturer seller of the product, where there was no evidence that the seller knew or should have known of the defect).

Here, there is no direct or circumstantial evidence that Glen or Daniel knew of the unreasonable risk of harm associated with a leak in the SeaStar hydraulic system. Glen testified that while doing routine maintenance eight months prior to the accident, a friend suggested that he add fluid to the system. Glen further stated that although he added a few teaspoons of fluid, he believed this to be part of routine maintenance, and did not serve as an indicator of any fault with the system. The Champion boat had been inspected annually with no indication of any defects and with no repairs made to its hydraulic system. While Glen admitted that on more than one occasion his Champion made an unidentifiable clicking sound, he testified that this sound only occurred when the boat was in reverse. Otherwise, he never had any issues with the steering system.

Similarly, Daniel testified that on the day of the accident he detected a leak at the point of connection between a hydraulic hose line and a mechanical housing at a nut on the boat's outboard motor. He then tightened the nut, believing he had solved the problem, and proceeded to take the boat out for the day.

6

Although Daniel also testified he heard a clicking sound coming from the boat on the day of the accident, he denied knowing the source of the sound or having any other cognizable issues with the boat.

Furthermore, there is no evidence to suggest Glen or Daniel should have known of the unreasonable risk of harm associated with a leak in the hydraulic system. Although Teleflex performed tests in 1989 and 2004 which confirmed that a very small loss of fluid in the hydraulic system could result in total failure of the steering system, users were not adequately warned of the associated risks. The warning on the bottom of the steering cylinder not only failed to warn of the risk of leaks, fluid loss, ejection, or death; it was also not visible from within the boat. Moreover, no warning label was placed near the steering wheel or near the steering pump where steering fluid is refilled. The manual was also void of adequate warnings. It mentioned nothing of system failure and the risk of ejection, and simply warned of leaks. Due to inadequate warnings, it is likely that a normally prudent boat owner would not have been aware of the risks.[1] Thus, we cannot conclude that Glen and Daniel should have known of the risk of harm associated with a loss of fluid in the hydraulic system.

Experts for Teleflex, Augusto Villalon and Eric Fetchko, each testified that "bumpy" or "mushy" steering should have adequately forewarned Glen and Daniel of the imminent danger before noticing a leak in the hydraulic system. Mr. Fetchko, inventor of the SeaStar hydraulic system, testified he "thought [it] had adequate warning in the noise and the reduction and the degradation of steering." He described that "mushy" steering would be felt at the helm, thus alerting the driver.

---

[1]The adequacy of warnings will be discussed in greater detail in appeal No. 15-1113.

No evidence, however, was presented to demonstrate that Glen or Daniel experienced these indicators, either in the weeks prior to the accident or on the day of the accident. Glen and Daniel both denied feeling "bumpy," "mushy," or any abnormal steering at any time prior to the accident. Moreover, had Glen or Daniel detected a steering issue, there is no evidence that a normally prudent person would have anticipated the impending failure of the system and risk of death.

Despite his earlier testimony, Mr. Villalon later conceded that a "click or a mushiness, means different things for different people[,] and that "[t]he people who do not understand it as a warning lack experience." Significantly, Mr. Villalon's testimony suggests that even if Glen or Daniel detected a steering issue, that they may not have found it to be significant, as there is also no evidence to suggest that Glen or Daniel were particularly experienced boaters. Additionally, and as confirmed by Stephen Killingsworth, an expert tendered and accepted in mechanical engineering, the "clicking" sound heard by Glen and Daniel was completely normal according to Teleflex's own documents. Mr. Killingsworth further testified that not only were these descriptive words subjective, but that the manual also failed to explicitly use any of these words to describe the steering malfunction indicators. Consistent with Teleflex's own documents, there is no evidence Glen or Daniel ignored any warning signs.

We are also persuaded by the testimony of Wildlife & Fisheries investigator, Sgt. David Liles. In his testimony, Sgt. Liles maintained that despite his extensive experience in working with boats, particularly ones with the same SeaStar hydraulic system, he was unaware of the risks associated with losing a mere 2.7 ounces of fluid in the hydraulic system—approximately 5% of the

8

system's capacity. Accordingly, there is no basis to conclude that Glen or Daniel, both far less experienced, were aware of the risks associated with diminished fluid levels.

Moreover, although Glen added fluid to the system and Daniel tightened a loose connection prior to the accident, we find that due to the lack of warnings, there is no evidence that they, or any prudent boat owner, would have consequently been alerted to the risk of a total system failure or grave injury. Therefore, the scope of duty to maintain the boat in reasonable repair does not extend far enough to hold Glen or Daniel liable for Derek's death.

Specifically, "[s]ome risks that arise because of a defendant's conduct are not within the scope of the duty owed to a particular plaintiff simply because they are unforeseeable." *Todd v. State Through Dep't of Soc. Servs., Office of Cmty. Servs.*, 96-3090, p. 7 (La. 9/9/97), 699 So.2d 35, 39. "The critical test in Louisiana, however, is phrased in terms of 'the ease of association' which melds policy and foreseeability into one inquiry: Is the harm which befell the plaintiff easily associated with the type of conduct engaged in by the defendant?" *Roberts v. Benoit*, 605 So.2d 1032, 1054 (La.1991) (citing Timothy J. McNamara, *The Duties and Risks of the Duty–Risk Analysis*, 44 La.L.Rev. 1227, 1234 (1984)).

> In determining the limitation to be placed on liability for a defendant's substandard conduct—i.e., whether there is a duty-risk relationship—we have found the proper inquiry to be how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced. *Hill [v. Lundin & Assocs., Inc.*, 260 La. 542, 256 So.2d 620 (1972).] Restated, the ease of association inquiry is simply: "How easily does one associate the plaintiff's complained-of harm with the defendant's conduct? . . . Although ease of association encompasses the idea of foreseeability, it is not based on foreseeability alone." Crowe, [*The Anatomy of a Tort–Greenian, as Interpreted by Crowe who has been Influenced by*

9

> *Malone–A Primer*, 22 Loy.L.Rev. 903 (1976).] Absent
> an ease of association between the duty breached and the
> damages sustained, we have found legal fault lacking.
> *Hill*, *supra*; *Sibley v. Gifford Hill and Co., Inc.*, 475
> So.2d 315, 319 (La.1985); *See also Williams v.
> Southfield School, Inc.*, 494 So.2d 1339, 1342 (La.App.
> 2d Cir.1986).

*Roberts*, 605 So.2d at 1045.

Here, we find no significant ease of association between Glen and Daniel's conduct and Derek Hebert's death, as it was not foreseeable that the hydraulic system would fail and that Derek would be ejected from the boat. Despite Glen and Daniel's actions prior to the accident, Teleflex offered no evidence to suggest that either of them knew or should have known of the unreasonable risk of harm associated with a de minimis loss of fluid. Thus, the trial court properly granted the directed verdicts in favor of Glen and Daniel Vamvoras.

For the foregoing reasons, the judgment of the trial court in appeal number 15-354 is affirmed.

### APPEAL NUMBER 15-1113

In this appeal, Teleflex asserts that the trial court erred in (1) granting a new trial to the plaintiff after the jury found no liability against Teleflex in the first trial; in (2) failing to instruct the jury in the second trial on the differing legal duties of a component part manufacturer and an end product manufacturer; and in (3) trying compensatory and punitive damages together in the second trial, instead of bifurcating the damage issues. Teleflex also assigned error in (4) the jury's finding that the evidence supported a punitive damage award; and in the alternative, in (5) the jury's excessive award of punitive damages.

10

Mr. Warren answered this appeal, asserting errors regarding legal interest in the December 2014 and June 2015 judgments, which are addressed below in the discussion of Mr. Warren's appeal, No. 15-838. In his answer, Mr. Warren also asserts error in the September 2014 judgment dismissing Teleflex, if this court finds that a new trial should not have been granted.

*New Trial*

Teleflex contends that, following the jury's verdict in its favor after the first trial, the trial judge erred in granting a new trial because the issue on which he based the new trial, the SeaStar steering system manual, was not relevant and material to the verdict, and it did not prejudice the plaintiff. Mr. Warren responds that the trial court correctly granted a new trial because the jury's verdict was tainted by improperly admitted and prejudicial evidence, and a factually incorrect instruction.

More specifically, at the end of the first trial, after jury deliberations had begun, the jury sent a written request to the judge for a copy of the SeaStar steering system manual and the American National Standard Product Safety Signs and Labels (ANSI) publication. Approximately forty minutes later, the jury sent the judge a question asking whether it had been given the 1997 SeaStar Manual made available with the original purchase of the boat in 1998. The trial court called a bench conference with counsel, and Teleflex's attorney assured the court that the jury had the manual provided with the boat in 1998. The jury was reseated, and the jury foreman told the judge that the manual indicated that it was a 2006 revision; he showed the judge the back of the manual, bearing the following:

©1997 TELEFLEX CANADA LIMITED PARTNERSHIP
PRINTED IN CANADA

11

Counsel for Teleflex indicated to the jury and to the court that the numbers on the last line were just the printer's code. The judge so advised the jury:

MR. FROHN:

That's just a printer's code of some kind.

THE COURT:

That's not a revision date?

MR. FROHN:

No, that's a – that's got to be a printer's code –

THE COURT [ADRESSING THE JURY]:

No. This is what purports to be the manual that was available, or that was produced in connection with the device that was in the boat. Yeah.

(Whereupon the jury exit[ed] the courtroom to deliberate.)

Thirty minutes later, the jury brought back a verdict finding no liability against Teleflex for a failure to warn.

Mr. Warren filed a motion for a new trial attaching excerpts from Eric Fetchko's deposition wherein various manuals were being discussed. During the deposition, for clarity, the manuals were identified by their revision dates on the last page, as follows:

Q. Is there a revision date on the document?

A. Yes.

Q. Can you show me where that would be?

A. I'm trying to find it. The very last page. It says the form number which is the form and if you look, you'll see date and rev.

. . . .

Q. So you're basically saying if you go to the last page and you look for the form number and to the right of that --for example, looking at 47, you see the numbers 15000-03/02 Rev R.

A. That's correct.

Q. That means it was revised in March of 2002?

A. That is correct.

Thus, the manual given to the jury bearing "07/06 Rev" was the July 2006 revision of the steering system manual. At the hearing on the motion for a new trial, it was revealed that the 1997 SeaStar Manual distributed with the sale of the boat in 1998, the manual that the jury asked for, was never introduced into evidence at trial. It was discussed at the hearing as being approximately thirty-two pages in length, while the 2006 revision given to the jury was approximately sixty pages in length.

In his motion for a new trial, Mr. Warren asserted both peremptory grounds and discretionary grounds for granting a new trial pursuant to La.Code Civ.P. arts. 1972(1) and 1973. Regarding peremptory grounds: "A new trial shall be granted, upon contradictory motion of any party . . . [w]hen the verdict or judgment appears clearly contrary to the law and the evidence." La.Code Civ.P. art. 1972(1). Regarding discretionary grounds: "A new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law." La.Code Civ.P. art. 1973.

In a motion for new trial under either La.Code Civ. Proc. arts. 1972 or 1973, the trial court may evaluate the

13

evidence without favoring either party; it may draw its own inferences and conclusions; and evaluate witness credibility to determine whether the jury had erred in giving too much credence to an unreliable witness. *Smith v. American Indem. Ins. Co.*, 598 So.2d 486 (La.App. 2 Cir.), *writ denied*, 600 So.2d 685 (La.1992). The applicable standard of review in such matter is whether the trial court abused its discretion. *Anthony v. Davis Lumber*, 629 So.2d 329 (La.1993).

*Lawson v. Mitsubishi Motor Sales of America, Inc.*, 05-257, p. 28 (La. 9/6/06), 938 So.2d 35, 54-55 (quoting *Joseph v. Broussard Rice Mill, Inc.*, 00-628 (La. 10/30/00), 772 So.2d 94, 104-05).

The trial court's standard for granting a new trial pursuant to Article 1973 is well-settled:

La.C.C.P. art. 1973 provides that the trial court may grant a new trial if there exists good grounds therefor. A proper application of this article necessitates an examination of the facts and circumstances of the individual case. When the trial judge is convinced by his examination of the facts that the judgment would result in a miscarriage of justice, a new trial should be ordered.

*Lamb v. Lamb*, 430 So.2d 51, 53 (La.1983) (citations omitted).

"A trial court has virtually unlimited discretion to grant a new trial when it is convinced that a miscarriage of justice has resulted, and, unless an abuse of discretion can be demonstrated, a trial court's action in granting or denying a new trial on discretionary grounds will not be reversed." *Heritage Worldwide, Inc. v. Jimmy Swaggart Ministries*, 95-0484, p. 3 (La.App. 1 Cir. 11/16/95); 665 So.2d 523, 526; *writ denied*, 96-0415 (La.3/29/96); 670 So.2d 1233. *See also*, *Watson v. Nelson*, 97-474 (La.App. 3 Cir. 10/29/97); 702 So.2d 1002; *writ denied*, 97-2958 (La. 2/6/98); 709 So.2d 738. Still, "the discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict." *Burris v. Wal-Mart Stores, Inc.*, 94-921, p. 6 (La.App. 1 Cir. 3/3/95); 652 So.2d 558, 561, *writ denied*, 95-0858 (La. 5/12/95); 654 So.2d 352.

14

*Johnson v. Mo. Pac. R.R. Co.*, 00-980, p. 5 (La.App. 3 Cir. 7/25/01), 792 So.2d 892, 896, *writ denied*, 01-2445 (La. 12/7/01), 803 So.2d 33.

Mr. Warren asserted that the jury's verdict was clearly contrary to the law and the evidence because the jury specifically asked for the manual that went with the steering system that failed, and they relied on the assurances by defense counsel and by the court that they were given the 1997 manual; and thus the relation of the manual to the system at issue was based upon multiple false assertions. He further asserts that the jury gave great significance to the authenticity and relevance of the manual they were given, and because it was factually impossible that the 2006 manual came with the 1998 steering system, the resulting verdict was tainted and contrary to the evidence in the case. He further asserts that this resulted in great prejudice and in a miscarriage of justice.

Teleflex contends that the adequacy of the manual was legally irrelevant because the Vamvorases testified that they never received a manual. We find this argument untenable because the jury *was* given a manual, and there was much testimony regarding tests on the steering mechanism that were done according to the manual. There was also testimony that the manual used was the one in the boat. At trial, the entire focus of this case was a failure to warn. The 2006 manual that the jury was given was a 60-page manual, approximately twice the length of the original manual. The 2006 manual stated that it was the "Installation Instructions and Owner's Manual." The entire first page was devoted to warnings and the admonition to "Observe Them Carefully!" It explained four levels of warnings and set forth four bolded blocks entitled "Danger," "Warning," "Caution," and "Notice." The "Danger" warning stated that it pertained to "Immediate hazards which WILL result in severe personal injury or death." The

15

"Warning" label stated that it pertained to "Hazards or unsafe practices which COULD result in severe personal injury or death." The last two warnings pertained to minor injury and property damage. The "Danger," "Warning," and "Caution" labels each contained the standardized safety symbol, a triangle with an exclamation point, located to the left of the signal word in the heading.

We counted seventy-nine "Warning" labels in the 2006 manual, with seventy-five of them occurring in the first fifty pages. A jury in a "failure to warn" case looking at such a manual after specifically asking for, and being told that it had received, the only manual that mattered, could have concluded that the manufacturer of the steering system had fulfilled its duty to warn by the sheer number of warnings, even if the warning decal on the system itself did not meet ANSI standards. This is particularly true where the ANSI publication given to the jury contained the following definitions on the first few pages. Definition 4.7 states that each safety sign may include up to three *panels*: one each for the *signal word*, the *message*, and the *symbol*. Section four then provided the following definitions:

> **4.10 safety alert symbol:** A symbol which indicates a potential personal safety hazard. It is composed of an equilateral triangle surrounding an exclamation mark and conforms to ANSI Z535.3-1991, Criteria for Safety Symbols.
>
> . . . .
>
> **4.14 sign classifications:** Various categories of signs, each with a distinct signal word and colors, which represent different levels of hazards.
>
> **4.15 signal word:** The word or words that designate a degree or level of hazard seriousness. The signal words for product safety signs are DANGER, WARNING and CAUTION.

**4.15.1 DANGER:** Indicates an imminently hazardous situation which, if not avoided, will result in death or serious injury. This signal word is to be limited to the most extreme situations.

**4.15.2 WARNING:** Indicates a potentially hazardous situation which, if not avoided, could result in death or serious injury.

**4.15.3 CAUTION:** Indicates a potentially hazardous situation which, if not avoided, may result in minor or moderate injury. It may also be used to alert against unsafe practices.

On page three of the ANSI publication, the section on "Sign or Label Format" contained the following mandates:

**6.3 Safety alert symbol**

A safety alert symbol, when used with the signal word, shall precede the signal word. The base of the safety alert symbol shall be on the same horizontal line as the base of the letters of the signal word. The height of the safety alert symbol shall equal or exceed the signal word letter height.

The 2006 Teleflex manual given to the jury adheres to the above instructions, plus others we have omitted to avoid repetition. By comparison, the 1997 manual, which the first jury never saw, contained only nine (rather than seventy-nine) "warning" labels, only three of which mentioned "property damage *and/or* personal injury," and none of which mentioned the possibility of death or even serious injury. None of the labels contained the triangle safety symbol; nor did they explain the levels of seriousness. The jury asked for both the 1997 manual and the ANSI standards for warnings; it is clear that the jury was trying to weigh the evidence. They came back a second time to make sure that they had the 1997 manual, and not a 2006 revision that was published a year after the accident and approximately four months after this suit was filed. Thirty minutes after being

17

assured that they had the 1997 manual, the jury, with false information and the wrong manual—a manual indicating repeated adherence to and compliance with many of the ANSI standards for product warnings—rendered a verdict for Teleflex finding no failure to warn.

Quoting *Lawson v. Mitsubishi*, 938 So.2d at 55, Teleflex states that a new trial, "is not to be used to give the losing party a second bite at the apple without facts supporting a miscarriage of justice that would otherwise occur." The actual quote from *Lawson* states: "***A conditional grant of a new trial is not to be used to give the losing party a second bite at the apple without facts supporting a miscarriage of justice that would otherwise occur***." *Id*. The statement in *Lawson* appears at the bottom of a paragraph discussing La.Code Civ.P. art. 1811(C)(1) and the procedure to employ *after* a JNOV is granted. The *Lawson* comment regarding "a second bite at the apple" refers to the requirement that the trial judge rule conditionally on a new trial, if any is filed, *in case* his grant of a JNOV is overturned. The JNOV is the first bite at the apple. Mr. Warren did not file a JNOV on the new trial issue.

Further, the *Lawson* case is significantly distinguishable because in the present case, the trial court provided good grounds for granting the new trial, as did the record on appeal. More specifically, in *Lawson*, a factually disparate and complex case involving evidence tampering, the doctrine of res ipsa loquitur, the granting of a JNOV, and the trial court's own motion for a new trial, the supreme court looked at the trial court's reasons for granting the new trial. Those reasons stated:

> This Court will also grant a new trial as to the
> issues of causation and damages. If the JNOV on

18

liability is vacated or reversed on appellate review, a new trial is alternatively granted as to that issue.

> The motion for new trial requires a less stringent test than for a JNOV as such a determination involves only a new trial and does not deprive the parties of their right to have all disputed issues resolved by a jury. Whether to grant a new trial requires a discretionary balancing of many factors. Unlike the standard applicable to a motion for JNOV, the trial judge may evaluate evidence without favoring any party and draw his own inferences and conclusions. Furthermore, the Louisiana Supreme Court has held that "when the trial judge is convinced by his examination of the facts that the judgment would result in a miscarriage of justice, a new trial should be ordered."

*Lawson*, 938 So.2d at 55 (quoting the trial court's "Judgment and Reasons").

Pursuant to the supreme court's review, it found that while the trial court cited the law supporting its discretionary authority to order new trials, the supreme court was unable to glean any "good grounds" for ordering a new trial from either the judgment or the record and trial transcripts. *Id*. It further found nothing in the record to indicate a miscarriage of justice resulting from the jury's verdict.

Conversely here, the trial court explained its reasons, with great factual detail, for believing that a miscarriage of justice would result from the jury's reliance upon the wrong evidence:

> The Court recollects the conversation that we had when the jury came back and had some concerns about the manual that they were looking for and whether it was the actual manual that would have been in the boat at the time it was shipped out and would have been the manual that would have been available for the Champion boat with the Teleflex steering when it was manufactured.
>
> In some respects I feel responsible for saying that this is the manual that is – that is applicable to this particular case. I did so based upon the assurances by counsel for Teleflex that the markings were not revision

19

dates at all, but were, in fact, printer's marks or words to that effect. It's now my belief that that information was inaccurate. Although it was not objected to, it obviously was important to the jury in making a determination about whether or not they believed that there was any fault committed by Teleflex in connection with this case. How they would have viewed the actual manual compared to what they did view, I don't have a clue. But I do feel like that it's basically a miscarriage of justice that they were given the wrong information and had they had the right information -- had I said, "You've got to rely on your memory. I can't tell you what it is." What they would have done with that manual that they had that was revised in '06, I don't know. I can't speculate, but it was important enough to them that they came back and asked about it. It was important enough to them that they looked at it. And if it was important enough to them, then it's important enough that we give them accurate information or we tell them to rely on their memory. I didn't do that, so I'm going to grant the motion for a new trial only as against Teleflex.

For all of the reasons discussed, we find no abuse of discretion in the trial court's granting of a new trial in this case.


***Jury Instructions***

Because this accident occurred on navigable waters, it is properly brought under general maritime law. *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 116 S.Ct. 619 (1996).

> "[A]bsent a controlling statute, maritime law is 'developed by the judiciary' and is an 'amalgam of traditional common-law rules, modifications of those rules, and newly created rules.'" *Conner v. Alfa Laval, Inc.*, 842 F.Supp.2d 791, 796 (E.D.Pa. 2012) (quoting *E. River Steamship*, 476 U.S. 858, 864-65 (1986). Within the context of a products liability case, a court may therefore "examine the development of products-liability law[] under both admiralty and state common law." *Id.*

*Gendelman v. Blumenstein*, No. 12-6976 (JEI), 2015 WL 3489883, at *4, (D.N.J. 6/2/15) (second alteration in original).

20

The applicable substantive law of products liability in admiralty is "informed by the American Law Institute's Restatement of Torts." *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 860 (9th Cir. 2011) (applying Restatement (Third) of Torts); s*ee also Dehring v. Keystone Shipping Co.*, No. 10-cv-13959, 2013 WL 3879619 (E.D. Mich. 7/26/13) (finding that the plaintiff was incorrect in its position that federal admiralty law only applied the product liability rules of the Restatement (Second) of Torts); *Regan v. Starcraft Marine LLC*, No. 06-1257, 2010 WL 996424 (W.D. La. 3/17/10) (applying the Restatement (Third) of Torts).

> Under maritime law, a manufacturer is liable for "harm caused by a product sold 'in a defective condition unreasonably dangerous.'" *Conner v. Alfa Laval, Inc.*, 842 F. Supp. 2d 791, 796 (E.D. Pa. 2012) (quoting Restatement (Second) of Torts § 402A (1965)). "Liability for defective products has grown into three distinct theories of liability: manufacturing defects, design defects, and defects based on inadequate warnings." *Id*. (citing Restatement (Third) of Torts: Prods. Liab. § 2 (1998)). "A manufacturer is also liable for the harm resulting from the negligent failure to warn of the risks created by its products." *Id*.

*Dandridge v. Crane Co.*, No. 2:12-cv-00484-DCN, 2016 WL 319938, at *2 (D.S.C. 1/27/16).

The trial court's instructions and charges to the jury[2] came from the Restatement of Torts, the Louisiana Product Liability Act (LPLA),[3] and cases thereunder.

---

[2]The jury instructions stated in pertinent part:

A DEFENDANT ACTS NEGLIGENTLY IF THE DEFENDANT DOES NOT EXERCISE REASONABLE CARE UNDER ALL THE CIRCUMSTANCES. PRIMARY FACTORS TO CONSIDER IN ASCERTAINING WHETHER A DEFENDANT'S CONDUCT LACKS REASONABLE CARE ARE THE FORESEEABLE LIKELIHOOD THAT THE DEFENDANT'S CONDUCT WILL CAUSE HARM, THE FORESEEABLE SEVERITY OF ANY HARM THAT MAY ENSUE, AND THE BURDEN OF

PRECAUTIONS TO ELIMINATE OR REDUCE THE RISK OF HARM. [RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 3 (2010).]

. . . .

ANY PERSON ORDINARILY HAS A DUTY TO EXERCISE REASONABLE CARE WHEN THE PERSON'S CONDUCT CREATES A RISK OF PHYSICAL HARM. [RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 7(a) (2010).]

IF A DEFENDANT HAS SKILLS OR KNOWLEDGE THAT EXCEED THOSE POSSESSED BY MOST OTHERS, THESE SKILLS OR KNOWLEDGE ARE CIRCUMSTANCES TAKEN INTO ACCOUNT IN DETERMINING WHETHER THE DEFENDANT HAS BEHAVED AS A REASONABLY CAREFUL PERSON. [RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 12 (2010).]

A DEFENDANT WHOSE CONDUCT CREATES A RISK OF PHYSICAL OR EMOTIONAL HARM CAN FAIL TO EXERCISE REASONABLE CARE BY FAILING TO WARN OF THE DANGER IF (I) THE DEFENDANT KNOWS OR HAS REASON TO KNOW OF THAT RISK, AND THAT THOSE ENCOUNTERING THE RISK WILL BE UNAWARE OF IT; AND (2) A WARNING MIGHT BE EFFECTIVE IN REDUCING THE RISK OF HARM. [RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 18(a) (2010).]

. . . .

A MANUFACTURER MUST USE REASONABLE CARE TO PROVIDE AN ADEQUATE WARNING OF DANGEROUS CHARACTERISTICS OF ITS PRODUCTS. IT IS A DUTY PLACED DIRECTLY UPON THE MANUFACTURER, AND IT CANNOT BE DELEGATED. [La.R.S. 9:2800.57(C); *Marks v. OHMEDA, Inc.*, 03-1446 (La.App. 3 Cir. 3/31/04), 871 So.2d 1148, *writs denied*, 04-1653, 04-1617 (La. 10/8/04), 883 So.2d 1019, 1020.]

A PRODUCT IS DEFECTIVE BECAUSE OF INADEQUATE WARNINGS WHEN THE FORESEEABLE RISKS OF HARM POSED BY THE PRODUCT COULD HAVE BEEN REDUCED OR AVOIDED BY THE PROVISION OF REASONABLE WARNINGS BY THE MANUFACTURER AND THE OMISSION OF THE WARNINGS RENDERS THE PRODUCT NOT REASONABLY SAFE. [RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. § 2(c) (1998).]

THE DETERMINATION OF WHETHER A WARNING IS ADEQUATE DEPENDS UPON A BALANCING OF CONSIDERATIONS, INCLUDING, AMONG OTHER FACTORS, THE SEVERITY OF THE DANGER, THE LIKELIHOOD THAT THE WARNING WILL CATCH THE ATTENTION OF THOSE WHO WILL FORESEEABLY USE THE PRODUCT AND CONVEY THE NATURE OF THE DANGER TO THEM, THE INTENSITY AND FORM [OF] THE WARNING AND THE COST OF IMPROVING THE STRENGTH OR MODE OF THE WARNING. [*Williams v. Super Trucks, Inc.*, 36,993 (La.App. 2 Cir. 4/9/03), 842 So.2d 1210, *writ denied*, 03-1303 (La. 9/5/03), 852 So.2d 1042.]

AN ADEQUATE WARNING IS A WARNING THAT WOULD LEAD AN ORDINARY USER OR HANDLER OF THE PRODUCT TO UNDERSTAND THE DANGER OF USING THE PRODUCT AND TO EITHER (1) DECIDE NOT TO USE OR HANDLE THE PRODUCT OR (2) TO USE OR HANDLE THE PRODUCT SAFELY. [La.R.S. 9:2800.53(9).]

[3]The pertinent portions of LPLA are located at La.R.S. 9:2800.51-59; in particular:

Louisiana Revised Statutes 9:2800.54 states:

A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.

B. A product is unreasonably dangerous if and only if:

(1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;

(2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;

(3) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or

(4) The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.

C. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.56 or 9:2800.57 must exist at the time the product left the control of its manufacturer or result from a reasonably anticipated alteration or modification of the product.

D. The claimant has the burden of proving the elements of Subsections A, B and C of this Section.

Louisiana Revised Statutes 9:2800.57 states:

A. A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

B. A manufacturer is not required to provide an adequate warning about his product when:

(1) The product is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics; or

*Component Parts Manufacturer*

Teleflex contends that the trial court erred in failing to instruct the jury that the duties of a component part manufacturer to provide warnings to the user are crucially different from those of the manufacturer of an end product sold to the public. Mr. Warren responds that the trial court correctly refused to give a component part instruction because Teleflex manufactured a steering "system," with a manual and warnings of its own, rather than a component part such as a raw material like sand or a nut or bolt.

It is well settled in Louisiana jurisprudence that "an appellate court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions." *Nicholas v. Allstate Ins. Co.*, 99-2522, p. 8 (La. 8/31/00), 765 So.2d 1017, 1023.[4] "The basis for this rule of law is that trial courts are given broad discretion in formulating jury instructions and it is well accepted that a trial court judgment will not be reversed as long as the charge correctly states the substance of the law." *Id*. "However, when the jury verdict is based on instructions which were faulty in a critical regard, the verdict is tainted and is not entitled to a presumption of regularity." *Billiot v. Terrebonne Parish Sheriff's Office*, 98-246, p. 4 (La.App. 1 Cir. 2/19/99), 735 So.2d 17, 21, *writ denied*, 99-1376 (La. 7/2/99), 747 So.2d 22. "The general rule . . . is that where an erroneous

<hr />

(2) The user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.

C. A manufacturer of a product who, after the product has left his control, acquires knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonably prudent manufacturer, is liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

[4]*Nicholas* involved, as here, the rejection by the trial court of a proposed jury instruction.

jury instruction is given that constitutes reversible error, the jury decision should be thrown out and the appellate court should undertake a de novo review of the record and implement its own judgment based on the evidence." *Id.*

"In a jury trial, the judge is not required to give the instructions submitted by either party; however, the trial judge is obligated to give instructions which properly reflect the law applicable in light of the pleadings and facts in each case." *Id.* Adequate instructions are those which fairly and reasonably point out the issues presented by the pleadings and evidence and which provide correct principles of law for the jury's application to the facts." *Id.* "It is the judge's responsibility to reduce the possibility of confusing the jury, and he may exercise the right to decide what law is applicable to prevent counsel from arguing law that the trial judge deems inappropriate." *Abadie v. Metro. Life Ins. Co.*, 00-344, p. 44 (La.App. 5 Cir. 3/28/01), 784 So.2d 46, 79, *writs denied*, 01-1533, 01-1534, 01-1543, 01-1544, 01-1629, 01-1853, 01-1931, (La. 12/14/01), 804 So.2d 642, 643, 644, *cert. denied*, *Territo v. Adams*, 535 U.S. 1107, 122 S.Ct. 2318 (2002).

> The adequacy of jury instructions must be determined in light of the instructions as a whole and the manifest error standard of review may not be ignored unless the instructions were so incorrect or inadequate as to preclude the jury from reaching a verdict based on the law and the facts.

*Id.* at 77-78 (citing *Fisher v. River Oaks, Ltd.*, 93-677 (La.App. 5 Cir. 3/16/94), 635 So.2d 1209, *writ denied*, 94-0932 (La. 6/3/94), 637 So.2d 503).

"Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice." *Nicholas*, 765 So.2d at 1023. The failure to give an instruction, even if erroneous, is not automatically prejudicial, nor does it automatically justify an

25

appellate court's de novo review. An appellate court must go one step further and assess the gravity of the error and consider the entirety of the instructions and circumstances of the case. *Wooley v. Lucksinger*, 09-571 (La. 4/1/11), 61 So.3d 507.

The instruction urged by Teleflex is drawn from RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. § 5 (emphasis added) which states:

> One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if:
>
> (a) the component is defective in itself, as defined in this Chapter, and the defect causes the harm; *or*
>
> (b)  (1) the seller or distributor of the component substantially participates in the integration of the component into the design of the product; and
>
> (2) the integration of the component causes the product to be defective, as defined in this Chapter; and
>
> (3) the defect in the product causes the harm.

Because the plaintiff's theory of liability at trial was that the steering system itself was defective due to an inherently dangerous risk that was not obvious to the user such that it required adequate warnings, and the warnings were not adequate, only part (a) above is applicable. However, the jury charge that Teleflex asked the judge to provide to the jury stated as follows:

> Product component parts include products that can be put to different uses depending on how they are integrated into other parts. The manufacturer of a component part is ordinarily not liable for failing to incorporate a safety feature that is peculiar to the specific adaptation for which another manufacturer utilizes the component part. A safety feature important for one adaptation may be wholly unnecessary or inappropriate

26

for a different adaptation. The same considerations also weigh against imposing a duty on the manufacturer of the component part to warn purchasers of the component part, or end-users of the completed part, of dangers arising from special adaptations of the component part by other manufacturers.

Teleflex attributed this language to the RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. § 5 cmt. d (1998). The above text is a partial paraphrase of Comment (d), one of the five comments, not the blackletter law of § 5 as previously quoted. The isolated comment above is not a fair representation of the law. It is indeed misleading where the Teleflex SeaStar hydraulic steering system at issue was specifically designed and marketed for installation in boats with single engine and twin engine motors of 300-600 horsepower. Reference to a "specific adaptation" is not relevant in this case. Moreover, comment d actually states:

> *Incomplete products.* Product components include products that can be put to different uses depending on how they are integrated into other products. For example, the chassis of a truck can be put to a variety of different uses. A truck chassis may ultimately be used with a cement mixer or a garbage compaction unit or in a flat-bed truck. Similarly, an engine for industrial machines may be adapted to a variety of different industrial uses. A seller ordinarily is not liable for failing to incorporate a safety feature that is peculiar to the specific adaptation for which another utilizes the incomplete product. A safety feature important for one adaptation may be wholly unnecessary or inappropriate for a different adaptation. The same considerations also militate against imposing a duty on the seller of the incomplete product to warn purchasers of the incomplete product, or end-users of the integrated product, of dangers arising from special adaptations of the incomplete product by others.

In the present case, the steering system was not put to different uses. It was made for boats, and it was installed in a boat. The reporters' notes under comment d indicate that the truck chassis referenced immediately above is drawn

from cases like *Verge v. Ford Motor Co.*, 581 F.2d 384 (3d Cir. 1978), holding that the chassis cab manufacturer had no duty to install a back-up alarm that was needed to make the ultimate end product, a garbage truck, safe. The steering system in the present case bears no resemblance to the generic chassis exemplified above. The court in *Woods v. Graham Engineering Corp.*, 539 N.E.2d 316, 320 (Ill. App. Ct. 1989) (emphasis added), held that "the manufacturer is to be held liable only when it is . . . responsible for the design of the final product *or the component part of the product that caused the injury*." To give only the partial language from one comment is not an adequate statement of the law.

We note that comment b on the other hand follows the language of the actual RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. § 5(a), where it states: "*Liability when a product component is defective in itself.* A commercial seller or other distributor of a product component is subject to liability for harm caused by a defect in the component." It references the other sections of RESTATEMENT (THIRD) OF TORTS: PROD. LIAB.—§§ 2(a), 2(b), 3, and 19—to illustrate that the liability for a component part manufacturer is the same as the liability of the product manufacturer if the component part is defective and caused the plaintiff's harm. Comment b under § 5 further states that "[t]he same principles apply in determining a component seller's duty to supply reasonable instructions and warnings to the component buyer." The reporters' notes provide examples under comment b illustrating the component part manufacturer's liability.

For example, if the component has a manufacturing defect that causes the plaintiff's harm, the fact that it was integrated into another product does not relieve the component-part manufacturer of liability. *See Bradford v. Bendix-Westinghouse Auto. Air Brake Co.*, 517 P.2d 406 (Colo. Ct. App. 1973) (truck

28

brake pedal assembly). Further, if the component is defectively designed for its designated use, liability may attach. *See Fleck v. KDI Sylvan Pools*, 981 F.2d 107 (3d Cir. 1992), *cert. denied*, 507 U.S. 1005, 113 S.Ct. 1645 (1993) (swimming pool liner with no depth markers); *Dougherty v. Edward J. Meloney, Inc.*, 661 A.2d 375 (Pa. Super. Ct. 1995) (defectively designed shut-off valve designed for use in boilers); *Parkins v. Van Doren Sales, Inc.*, 724 P.2d 389, 392 (Wash. Ct. App. 1986) (conveyor components always presented a risk to users).

Here, the trial judge did not think the steering system "fit" into the definition of a component part in the context of the suggested jury charge, stating that:

> [A]lthough it was part of the boat sold as a whole, the system itself was a system in and of itself that was designed to do a certain part. And just because it was a component part of the boat [it] doesn't fit it into that definition for me.

We make no ruling regarding the official classification of the system because we do not have to in deciding this case. The jury charge is not representative of the substance of the law on component parts.

We find *Aubin v. Union Carbide Corp.*, 12-2075 (Fla. 10/29/15), 177 So.3d 489, instructive as it is factually and legally analogous to the applicable principles on jury instructions in this failure-to-warn product liability case. There, a laborer who developed mesothelioma from exposure to construction materials containing asbestos received a jury verdict in the amount of $6,624,150.[5] The jury attributed 46.25% of the fault to Union Carbide and 53.75% of the fault to several intermediary manufacturers listed on the jury verdict form. At trial, both parties had asked for a jury instruction on the asbestos manufacturer's duty to warn end-

---

[5]The jury's award was $14,191,000, but the trial court reduced it to $6,624,150.

users of the dangers in products containing asbestos. The trial court accepted the plaintiff's suggested jury charge and rejected the defendant's jury charge on the "learned intermediary" defense. The court of appeal reversed, finding that the trial court erred in its findings on design defect and causation, and, in failing to give the requested jury charge on the learned intermediary defense.

The Florida Supreme Court ordered reinstatement of the trial court's judgment. The supreme court agreed with the appellate court that the defendant was entitled to a jury charge on the learned intermediary defense, but found no reversible error in the trial court's failure to give the charge because the jury charge requested by Union Carbide did not accurately reflect the law. We find the supreme court's analysis particularly instructive in this case where a component part charge might have been applicable if properly stated. The court articulated as follows:

> A party is entitled to have the jury instructed on the theory of its case when the evidence supports that theory. *See OB/GYN Specialists of Palm Beaches, P.A. v. Mejia*, 134 So.3d 1084, 1091 (Fla. 4th DCA 2014); *Barkett v. Gomez*, 908 So.2d 1084, 1086 (Fla. 3d DCA 2005). To demonstrate that the trial court erred in failing to give a requested jury instruction, a party must show "the requested instruction contained an accurate statement of the law, the facts in the case supported a giving of the instruction, and the instruction was necessary for the jury to properly resolve the issues in the case." *Barkett*, 908 So.2d at 1086; *see also Force [v. Ford Motor Co.]*, 879 So.2d [103,] 106; *Smith v. Hugo*, 714 So.2d 467, 468 (Fla. 4th DCA 1998).

*Aubin*, 177 So.3d at 517.

In *Aubin*, Union Carbide's requested jury charge and the court's rejection of it are similar to our analysis above. The defendant's charge read:

> In considering what constitutes reasonable care in connection with William Aubin's failure to warn claim,

30

your consideration may include, but is not limited to, the following factors:

> • the warnings Union Carbide provided to its customers who used Union Carbide's asbestos in making joint compound or ceiling sprays,
>
> • whether Union Carbide asbestos customers were aware of the dangers involving asbestos,
>
> • whether Union Carbide had access to joint compound and ceiling spray end customers, and
>
> • whether Union Carbide had the ability to require customers to give specific warnings to users of the products incorporating Union Carbide's asbestos.

*Id.* at 518.

The Florida Supreme Court rejected the charge, reasoning as follows:

> After examining the record and comparing the cases in support of the proposed jury instructions with the proposed instructions themselves, we reject Union Carbide's argument that the trial court committed reversible error in failing to instruct on this theory. The special jury instructions requested by Union Carbide did not provide an accurate statement of the law as to this defense. In order to show that the trial court erred in failing to give its requested jury instruction, Union Carbide must show "the requested instruction contained an accurate statement of the law, the facts in the case supported a giving of the instruction, and the instruction was necessary for the jury to properly resolve the issues in the case." *Barkett* [*v. Gomez*], 908 So.2d [1084,] 1086 [(Fla. 3d DCA 2005)].
>
> This Union Carbide has not done. In fact, some of the factors that Union Carbide proposed are directly contrary to principles of law established in other asbestos litigation and in the cases that the proposed jury instructions relied upon. For example, one of the factors proposed by Union Carbide was whether the intermediaries were aware that asbestos is dangerous. However, as the Fourth District correctly recognized in

*McConnell* [*v. Union Carbide Corp.*], 937 So.2d [148,] 154 [(Fla. 4th DCA 2006),] a jury would be reasonably misled by such a jury instruction that strongly implies that a learned intermediary's specific knowledge about a defect, rather than the end user's knowledge, is the focus of Florida's strict liability law. Likewise, the factor that the jury should consider whether Union Carbide had access to the learned intermediary's customers is misleading, as neither the caselaw nor the Second Restatement have recognized that manufacturers must have direct access to the end user. . . .

. . . .

"When non-standard instructions are proposed, trial courts face an analytical task similar in kind to that performed by the thirty-two member Florida Standard Jury Instructions Committee—without the luxury of time." *R.J. Reynolds Tobacco Co. v. Jewett*, 106 So.3d 465, 469 (Fla. 1st DCA 2012). Thus, non-standard proposed instructions must be legally accurate and factually relevant. *Id.*

*A party cannot complain on appeal that a trial court committed reversible error by failing to correct that party's own inaccurate and misleading proposed instructions.* In fact, permitting parties to raise such issues on appeal would invite parties to deliberately propose inaccurate instructions so that such a party could either complain that the trial court committed reversible error in failing to correct the error or that the trial court erred in how it corrected the inaccurate instructions. Since Union Carbide's proposed jury instructions did not contain an accurate statement of the law, the trial court did not err in failing to give these instructions.

After reviewing the jury instructions as a whole, we conclude that the instructions given by the trial court were not misleading.

*Id*. at 518-19 (emphasis added).

Similarly here, in reviewing the jury charges as a whole, we find that the trial court's instructions correctly stated the substance of the law on defective products and the duty to warn and did not mislead the jury or prevent it from dispensing justice. In fact, the jury charge proposed by Teleflex *would* have

misled the jury because it omitted the essence of the section of law that it referenced. We find no abuse of discretion or reversible error in the trial court's refusal to accept Teleflex's proposed jury charge in this case.

### *Bifurcated Damages*

Teleflex contends that the trial court erred in failing to bifurcate the adjudication of compensatory damages from the adjudication of punitive damages, resulting in substantial prejudice to Teleflex such that the judgment must be vacated. Mr. Warren responds that, contrary to Teleflex's suggestion, the law does not require, or even recommend the bifurcation of liability and punitive damages. He points out that the first trial was bifurcated because there were multiple defendants, some of whom were subject to punitive damages and some who were not. Thus, the trial court bifurcated the damages to avoid confusion and prejudice to other parties. The second trial, on the other hand, involved only one defendant, Teleflex.

"A new trial may be granted, upon contradictory motion of any party or by the court on its own motion, to all or any of the parties and on all or part of the issues, or for reargument only." La.Code Civ.P. art. 1971. Pursuant to Article 1971, the trial court has the power to define and limit the scope of the new trial. *Devillier v. Traders & Gen. Ins. Co.*, 321 So.2d 55 (La.App. 3 Cir. 1975), *writ denied*, 325 So.2d 273 (La.1976); *Russell v. McDonald's Corp.*, 576 So.2d 1213, (La.App. 5 Cir. 1991). "The court has the power to require that the proceedings shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at the trial, so that justice is done." La.Code Civ.P. art. 1631(A).

33

In *Myers v. National Union Fire Insurance Co. of Louisiana*, 11-751 (La.App. 4 Cir. 4/4/12), 90 So.3d 522, *writ denied*, 12-1017 (La. 6/22/12), 91 So.3d 975, a helicopter pilot made a forced landing in the Gulf of Mexico. The injured passengers sued various parties and insurers and brought a product liability case against the helicopter manufacturer. When the trial court ordered that punitive and compensatory damages would be tried together, the manufacturer appealed, arguing that the order was improper because the manufacturer's liability for punitive damages pursuant to maritime law would have to be tried along with compensatory damages. In support it cited La.Code Civ.P. art. 1562, which states (emphasis added):

> A. If it would simplify the proceedings or would permit a more orderly disposition of the case or otherwise would be in the interest of justice, at any time prior to trial the court may order, *with the consent of all parties*, separate trials on the issues of liability and damages, whether or not there is to be a jury trial on either issue.

> B. If a defendant has been found liable by a jury, *the court shall proceed* with the trial on the remaining issues *before the same jury unless all parties consent to a trial before a different jury.*

> C. Notwithstanding the provisions of Paragraph B of this Article, in a jury trial, the court may order, *with the consent of all the parties*, that a separate trial on the issue of damages shall precede a trial on the issue of liability.

> D. If it would simplify the proceedings or would permit a more orderly disposition of the case or otherwise would be in the interest of justice, at any time prior to trial on the merits, the court may order, *with the consent of all parties*, a separate trial on the issue of insurance coverage, unless a factual dispute that is material to the insurance coverage issue duplicates an issue relative to liability or damages. The issue of insurance coverage shall be decided by the court alone, whether or not there is to be a jury trial on the issue of liability or damages.

34

The court in *Myers* found nothing in Article 1562 to prohibit trying the damages before the same jury. Nor was it convinced that the jury would be unduly influenced or confused by trying the issues together.

Here, it is Mr. Warren who invokes Article 1562, pointing out that bifurcating the damages cannot be ordered without the consent of both parties. The statute plainly states this in all four of its Paragraphs (A)–(D). Teleflex argues that Article 1562 does not address a case such as *Dugas v. Automotive Casualty Insurance Co.*, 98-807 (La.App. 5 Cir. 2/10/99), 729 So.2d 25, where a trial court can bifurcate the issues, using the same jury, by limiting the details in voir dire and then obtaining a verdict on liability before allowing evidence of punitive damages. The operative quote, however, from *Dugas* states, "The trial court has great discretion in the manner in which proceedings are conducted before his court, and it is only upon a showing of gross abuse of discretion that appellate courts have intervened." *Dugas*, 729 So.2d at 27 (citing *Harris v. West Carroll Parish School Bd.*, 605 So.2d 610 (La.App. 2 Cir. 1992), *writ denied*, 609 So.2d 255 (La.1992)). We find no abuse of discretion in the trial court's decision to try the compensatory and punitive damages together.

*Liability and Compensatory Damages for Failure to Warn*

Teleflex appealed the jury verdict finding it liable for compensatory damages for its failure to warn of the inherent danger in its product. In finding that Teleflex was negligent and that its negligence was a cause-in-fact of Derek's death, the jury implicitly found that Teleflex had a duty, and breached the duty, to warn users that a hydraulic fluid leak in the steering system would cause the boat to spin

out of control, eject its passengers, and possibly throw them into the propeller. The evidence and testimony at trial supported this finding.

Teleflex's SeaStar hydraulic steering system consists of three major parts. The *helm pump* is mounted to the steering wheel (installed underneath or alongside it; here, underneath). Connected to the pump are two fluid-filled *hydraulic hoses* which run under the boat deck to the back of the boat. There, the hoses connect to either end of a *cylinder* which is mounted horizontally to the front of the outboard motor. When the wheel is turned left or right, additional hydraulic fluid is pumped into the corresponding hose which then forces the cylinder's piston to move the motor. The SeaStar is a closed system, which means that it is designed to move fluid, not consume it. If there is fluid loss, there is a leak, which may eventually happen due to connections using metal couplings and rubber O-rings. Air then gets into the line and changes the steering response, causing what is referred to as a spongy feeling by the compression of air.

At this point, the system can still be operated and the boat controlled. With enough fluid loss, however, control of the boat is taken completely out of the hands of the driver, and the motor goes into a free spin, kicking completely to one side. The boat turns suddenly on its own axis, referred to in the industry as a "J-hook" or "kill spin." Occupants are often ejected and are immediately in danger of being struck by the spinning propeller, even if the throttle is shut down. The evidence clearly revealed that Teleflex, a very sophisticated boating industry manufacturer,[6] was well aware of this phenomenon.

Eric Fetchko, currently Vice President and General Manager of SeaStar Solutions, Richmond, British Columbia, went to work for Teleflex in

---

[6]Teleflex is in fact the largest steering system manufacturer in the world.

1986, and invented the SeaStar hydraulic steering system in this case. He testified that Teleflex knew about the problem but that the problem could not be designed out of the system. Expert Augusto Villalon, a consultant for the Coast Guard, testified that, given his background, *he* knew what to expect with fluid loss in a hydraulic steering system. However, Sgt. Liles, a very experienced boating professional, testified that all of the Wildlife & Fisheries boats had this type of system, and no one knew that this could happen. He indicated that they were going to cover this issue in their future teaching program because the motoring public was unaware of the danger. Glen and Daniel Vamvoras testified that they certainly did not know of the danger. Glen Vamvoras said that he never would have let his son Daniel drive the boat or put his friends in the boat if he had known of the danger. Daniel filed an affidavit stating that he would have heeded a warning if one had been provided.

ANSI provides guidance for manufacturers to alert users of their products to potential personal injury hazards inherent in their products. We have already discussed the July 2006 manual, published a few months after this suit was filed, that partially complied with the 1991 ANSI standards, although it was too late and too little to satisfy the warning requirements. This is because warnings in a manual are not sufficient. The warnings should have been on the steering system itself, which the following definitions and provisions make clear (emphasis added):

> **4.11 safety sign:** A visual alerting device in the form of a decal, label, placard, or other marking such as an embossing, stamping, etching, or other process which advises the observer of the nature and degree of the potential hazard(s) which can cause injury or death. It can also provide safety precautions or evasive actions to take, or provide other directions to eliminate or reduce the hazard.

. . . .

**4.11.2 product safety sign or label:** Sign, label, or decal *affixed to a product* that provides hazard and safety information about that product.

**4.11.2.1 permanent safety sign or label:** Information *affixed to a product to warn against potential exposure to hazards inherent in the normal use of or associated with the product, or which might be created during reasonably anticipated product use*. The sign or label is to be *permanently affixed to the product so that it cannot be easily removed.*

**5.1 Hazard classification**

Product safety signs and labels are classified according to the relative seriousness of the hazard situation. The determination is based upon an estimation of the likelihood of exposure to the hazardous situation and what could happen as a result of exposure to the hazard. For products, there are three hazard classifications which are denoted by the signal works DANGER, WARNING or CAUTION.

. . . .

**9.1 Location**

Product safety signs and labels shall be placed such that they will: (1) be readily visible to the intended viewer and (2) alert the viewer to the potential hazard in time to take appropriate action.

Engineering and safety expert Stephen Killingsworth testified that when a product has an inherently dangerous feature that cannot be designed out of the product, the manufacturer has a duty to warn of the specific danger. In this case the inherent danger was that a very small loss of fluid would result in loss of steering that could cause ejection and death. The warning needed to contain a signal or key word to get the user's attention, and the text needed to instruct the user to stop and repair fluid loss immediately to avoid the consequences. The warning needed also to be placed where it would be seen and in proximity to the

hazard.  In Mr. Killingsworth's opinion, Teleflex had a duty to put a sticker or decal on the front helm pump where the driver would see it at the wheel and where the oil is actually added.  He also testified that another decal had to be put on the back cylinder of the steering system in a position that it could be seen at the site of the leak.  This is consistent with the ANSI standards and the applicable law in this case:

> In considering whether a warning in an instruction manual is inadequate because it should have been placed on the product itself, a court must consider the nature and severity of danger to be warned against, likelihood that the product will be used by persons who have not read the manual, practicality and effectiveness of placing the warning on the product itself, and any other relevant factors.

*Jaeger v. Auto. Cas. Ins. Co.*, 95-2448, pp. 8-9 (La.App. 4 Cir. 10/9/96), 682 So.2d 292, 297, *writ denied*, 96-2715 (La. 2/7/97), 688 So.2d 498 (citing *Black v. Gorman-Rupp*, 94-1494 (La.App. 4 Cir. 5/16/95), 655 So.2d 717).

In *Pavlides v. Galveston Yacht Basin, Inc.*, 727 F.2d 330, 338 (5th Cir. 1984) (footnote omitted), the federal Fifth Circuit stated:

> It is a fundamental principle of the law of product liability in this Circuit that a manufacturer has a responsibility to instruct consumers as to the safe use of its product and to warn consumers of dangers associated with its product of which the seller either knows or should know at the time the product is sold.  *Borel* [*v. Fibreboard Paper Prods. Corp.*], 493 F.2d [1076, 1088-90 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127 (1974)]; *see* Restatement (Second) of Torts, Section 402 A. comment j.  In assessing what hazards are foreseeable, a manufacturer is held to the status of an expert.  *Borel*, 493 F.2d at 1089.  The lack of adequate warnings renders a product defective and unreasonably dangerous even if there is no manufacturing or design defect in the product.  *Martinez v. Dixie Carriers, Inc.*, 529 F.2d 457, 465-66 (5th Cir.1976); *Reyes* [*v. Wyeth Labs.*,] 498 F.2d [1264,] 1272-73 [(5th Cir. 1974), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687 (1974).]

In *Hooker v. Super Products Corp.*, 98-1107, pp. 28-29 (La.App. 5

Cir. 6/30/99), 751 So.2d 889, 905, *writs denied*, 99-2911, 99-2947 (La. 12/17/99),

751 So.2d 880, 884, the court stated:

> Under the circumstances of this case, warnings should have been placed on the truck in such a manner that all operators could have been aware of the danger of being near the hose or hose shield *on this particular vehicle*. If there was any warning decal on the truck at all, it was definitely not on the side where plaintiff was working. The danger of being near a hose which could possibly rupture cannot be considered open and obvious, since handling a similar hose was part and parcel of plaintiff's usual occupation.

> > Once the trier of fact determines that the inherent danger is not obvious, and the consumer is not aware of or trained to detect that danger, then the warning, or lack thereof, must be scrutinized. *Clark v. Jesuit High School of New Orleans*, 572 So.2d 830 (La.App. 4th Cir.1990), *writ denied*, 576 So.2d 48 (La.1991). Therefore, the warning must be: (1) properly worded to signify the intensity of the inherent danger in the product; (2) properly placed on the product so that the consumer cannot avoid seeing it; and (3) it must convey to the consumer that injury or damage can result from a normal or intended use of the product. *Id.* The manufacturer can then present evidence to show its product either did not require a warning or that the warning that was provided was adequately worded or placed. *Id.*

> *Asbestos Plaintiffs v. Bordelon, Inc.*, 96-525 (La.App. 4th Cir.10/21/98), 726 So.2d 926, 1998 WL 790680.

> Plaintiff testified that had he read a warning about the hose, he would have heeded it. In the present case there was no warning for plaintiff to see.

Similarly, in this case, the driver of the boat testified that he would

have heeded such a warning. But the only text on the helm in this case advised to

check the fluid level and hoses without any mention of the loss of steering resulting in ejection from the boat and possible death. Based upon the evidence and the law presented to them, the jury found that the Teleflex system had an inherent danger unknown to users, that Teleflex had a duty to warn users of such dangers, and that Teleflex was negligent in its failure to warn. We find no error in the jury's finding of liability against Teleflex.

### Punitive Damages

With admiralty jurisdiction comes the application of substantive admiralty law. *Yamaha Motor Corp.*, 516 U.S. 199. Because Derek was a non-seafarer, and therefore not subject to an overlapping federal statute such as the Merchant Marine Act of 1920 (Jones Act), the Longshore and Harbor Workers' Compensation Act (LHWCA), or the Death on High Seas Act (DOHSA), punitive damages are available under general maritime law. *Doxey v. Lake Charles Pilots, Inc.*, 00-530 (La.App. 3 Cir. 1/31/01), 781 So.2d 589, *writ denied*, 01-614 (La. 5/4/01), 791 So.2d 654, *cert. denied*, 534 U.S. 895, 122 S.Ct. 215 (2001).

"Punitive damages are rarely imposed but have long been recognized as an available remedy in general maritime actions where defendant's intentional or wanton and reckless conduct amounted to a conscious disregard for the rights of others." *Poe v. PPG Indus.*, 00-1141, p. 6 (La.App. 3 Cir. 3/28/01), 782 So.2d 1168, 1173. In *Poe* we stated:

> This court has held on numerous occasions that punitive damages are available under a general maritime claim. In *Jenkins v. Kerr–McGee Corp.*, 613 So.2d 1097 (La.App. 3 Cir.), *writs denied*, 616 So.2d 701, 702 (La.1993), this court noted that punitive damages are meant to punish and deter and are recoverable under the general maritime law on a showing of willful and wanton misconduct by the shipowner. "In order to recover

punitive damages in a maritime case, a plaintiff must establish a higher degree of fault than simple negligence." *Bergeron v. Mike Hooks, Inc.*, 626 So.2d 724, 728 (La.App. 3 Cir.1993). This court further held that "[p]unitive damages are recoverable under general maritime law for acts which are willful, wanton, and in callous disregard for the safety of others; this requires a showing of bad faith." *Id.* (citing *Harper v. Zapata Off-Shore Co.*, 741 F.2d 87 (5th Cir.1984)). Furthermore, this court in *Strawder v. Zapata Haynie Corp.*, 94–453, 94–454 (La.App. 3 Cir. 11/2/94); 649 So.2d 554 held that plaintiffs, crew members who died aboard a fishing vessel that exploded after it struck an unmarked submerged natural gas pipeline, were not precluded from recovering punitive damages.

Teleflex contends that there was no evidence of wanton, reckless, or callous conduct. Consequently, it argues, an award of punitive damages is not supported. Mr. Warren responds that Teleflex recklessly chose not to warn users of its product's inherently deadly risk that was not obvious to the public. He asserts that the trial court correctly instructed the jury on Teleflex's liability for punitive damages under the general maritime law. We agree. Here, again, the evidence in the record supports the jury's finding that an award of punitive damages was appropriate.

The evidence revealed that Teleflex not only knew about the steering loss, but it had tested the system and documented the test results in 1989, nine years before this system was sold, and approximately sixteen years before this accident. The jury was likely influenced by the startling results of the tests and considered it wanton and reckless to ignore such results when an inexpensive stick-on warning decal costing thirty ($.30) cents could have saved a life. Additionally, the jury could have found callous disregard for the safety of others in the terminology and testimony of the system's designer.

More specifically, the record reveals that the hydraulic steering system at issue held approximately 2000 milliliters of hydraulic fluid. The hand-written test results, dated July 19, 1989, stated that its purpose was to "test the effect that oil loss has on the function of the compact helm." The procedure consisted of testing the steering by removing 8 milliliters of fluid at a time (approximately .25 ounces or 1.5 teaspoons). Since the helm pump could be installed in three configurations—vertically, horizontally, or at a 45 degree angle—the test was performed on the helm pump in all three positions. In this case, the helm pump was installed vertically, underneath the steering wheel, so that it appeared as if the pump were part of a steering column. The test results for the vertical installation were as follows:

When 24 ml was removed, the oil loss was noticeable.

At 48 ml the helm was bumpy at hard over.

At 64 ml total loss of steering.

Thus, the steering felt slightly different when fluid loss reached 4.8 teaspoons, or .78 ounces. When fluid loss reached 9.6 teaspoons, or 1.56 ounces, the steering helm felt bumpy when turning hard left or hard right, but the driver could still control the boat. When fluid loss reached 12.8 teaspoons, or 2.08 ounces, there was no control of the steering whatsoever. Thus, the difference between operational and a deadly loss of control was, by our calculations 3.2 teaspoons. Mr. Warren's counsel demonstrated the fluid loss to the jury using a Nyquil-type measuring cup and explaining that the difference between being able to drive the boat and losing all control of the boat was only a matter of a few teaspoons.

The jury was likely influenced by the magnitude of the risk—that losing only a few percent of the system's overall fluid content could result in ejection from the boat and death. Yet, the system's designer admitted that the system was designed so that a user could drive a boat with the SeaStar system and never have to add fluid for the lifetime of the boat. The jury heard much testimony regarding the unknowability of the seriousness and magnitude of the risk by the motoring public. And, the jury implicitly considered the ease with which the problem could have been remedied by simply putting a warning sticker on the product itself, which had been a well-established safety standard for some time.

The jury could have also interpreted a callous disregard for the safety of others based upon the testimony of Teleflex SeaStar designer, Eric Fetchko, who testified that Teleflex did not want to cause "mass hysteria" by putting a more specific warning on the product itself. He analogized the present situation to the lack of a warning on an airline boarding pass that, if the motor stopped, the plane would fall out of the sky. Mr. Fetchko also compared the need for a warning regarding the risk of death after fluid loss, measured by teaspoons, to the need for a warning not to slam your knuckles in a car door. He repeatedly testified that, at the time this system was sold in 1998, Teleflex *assumed* that the different feel in the steering response would alert users that they had a problem. He stated that hindsight was a "wonderful thing" and repeatedly said that "times change."

Yet, the standards for warnings applicable at the time were published in 1991, seven years before this system was sold. And Teleflex's own testing gave it the knowledge, even earlier in 1989, of the total failure of its system depending on minor amounts of fluid loss in the increments of teaspoons. Mr. Fetchko

admitted that the 1989 testing, accomplished by removing small amounts of fluid at a time, was performed with an eye-dropper. He also admitted that the company had received thousands of complaints regarding fluid loss, but said the numbers must be kept in context because Teleflex had sold millions of the systems. The jury could have found the murky soup of logic hard to swallow, that is, that the same company that received thousands of complaints of fluid loss also knew that a minimal amount of fluid loss could end in death; but the frequency was not high enough to justify a valid and effective warning. In responding to questions regarding the action that Teleflex took in other matters of malfunction, Mr. Fetchko's cross-examination concluded with the following colloquy:

> A. Okay. For sure, the -- the tubing we got from a supplier was -- had cut lines in it or something. It was quite a large amount. We contacted the Coast Guard. They said, "What was the frequency?" We told them how much. They said, "That's a lot. Find all the customers. Notify everyone. Send them a registered letter. Get the stuff back." We did. If I went -- or our liability people went and said Okay, we've got a boat. It wasn't maintained. Lost steering. Guy got thrown out, ejected, terrible accident." The first thing the Coast Guard would say, "How many have you built?" "Two million." "How many times has this happened?" "Oh it happened this once." That's -- so the first thing they'll look at is the frequency.
>
> Q. Are you telling the jury that this is the only –
>
> A. No, I'm not.
>
> Q. -- death case?
>
> A. -- no, I'm not. Hold a sec. Hold a sec. I was making a point that the first thing they'll ask is frequency. Whether it's one death or five deaths in two million. The first thing they'll look at is frequency. And they'll look at it and say, "That's probably not a -- I don't work for the Coast Guard, but in the past we've gone to them and said Four frequency out of 10,000." "No, just," you know, "deal with it." I -- I don't think they would have

45

put something up on their website even if we'd have asked them. But, again, I don't work for the Coast Guard.

. . . .

Q. You made it clear, Mr. Fetchko, you're not a warnings expert, but you're an engineer?

A. Yes.

Q. And you agree that at some point in the operation of a system that has a steering fluid leak, one more drop and you lose total control?
A. Correct.

Q. So if you don't know how much you've lost, that means if you've got a steering fluid leak you need to stop operation of the boat now, right then. You don't drive it back from the Country Club, do you?

A. If you do, you drive at a very slow speed.

Q. Because if you do drive it back and get up on plane you don't appreciate the harm. You can be ejected and killed?

A. Yes.

Q. And nowhere on any of the SeaStar products on that boat or any other boat that was built back then does it say, "Steering fluid leak means stop."

A. In hindsight, that's correct.

Based upon the foregoing, we find that the record supports the jury award of punitive damages.

*Excessiveness*

Teleflex contends alternatively that if we find support for punitive damages, the jury's award of punitive damages is grossly excessive as a matter of federal maritime and constitutional law. Mr. Warren responds that the punitive

46

damage award is constitutionally permitted, supported by the law and the record, and within the jury's vast discretion.

> The purpose of exemplary damages is to punish the defendant and deter future similar behavior. These damages are regarded as a fine or penalty for the protection of the public interest. *Mosing v. Domas*, 02-12 (La. 10/15/02), 830 So.2d 967. The following factors are considered in determining whether the award is too high or low: (1) the nature and extent of the harm to the plaintiff; (2) the wealth or financial situation of the defendant; (3) the character of the conduct involved; (4) the extent to which such conduct offends a sense of justice and propriety; and (5) the amount necessary to deter similar conduct in the future. *Id.* The amount of exemplary damages is the result of a fact-intensive inquiry into the case. These awards should only be disturbed if the damages are such that "all mankind at first blush would find [them] outrageous." *Id.* at 972 (quoting *Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415, 421-22, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994)).

*Rachal v. Brouillette*, 12-794, p. 10 (La.App. 3 Cir. 3/13/13), 111 So.3d 1137, 1145 (alteration in original), *writ denied*, 13-690 (La 5/3/13), 113 So.3d 217.

Historically, in Louisiana, the amount of an exemplary damage award has been reviewed by the appellate courts for abuse of discretion. *Riser v. Acadiana Limousine Serv., Inc.*, 96-1687 (La.App. 3 Cir. 4/30/97), 693 So.2d 330, *writ denied*, 97-1420 (La. 9/19/97), 701 So.2d 173. This practice is similar to the review that has evolved under the common law. However:

> In recent years, the U.S. Supreme Court has decided a number of cases raising exemplary damages issues. Most significantly, in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Court ruled that exemplary damage awards that are "grossly excessive" violate the Due Process Clause of the Fourteenth Amendment. The Court then provided three "guideposts" for gauging when an exemplary damage award crosses the constitutional line: (1) the reprehensibility of the defendant's conduct; (2) the ratio between the exemplary damage award and the harm the defendant's conduct caused, or could have

47

> caused; and (3) the size of any civil or criminal penalties
> that could be imposed for comparable misconduct. These
> constitutional constraints on the amount of exemplary
> damage awards were afforded more significance in
> *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*,
> [532 U.S. 424, 121 S.Ct. 1678 (2001)]. Therein, the
> Supreme Court ruled that *state and federal appellate*
> *courts must conduct a de novo review of claims that*
> *exemplary damage awards are grossly excessive in*
> *violation of the Due Process Clause* of the Fourteenth
> Amendment to the United States Constitution. *Cooper*,
> 532 U.S. at 433-434, 121 S.Ct. at 1685-1686.

*Mosing v. Domas*, 02-12, p. 6 (La. 10/15/02), 830 So.2d 967, 972-73 (emphasis added).

Teleflex has raised the constitutionality of the $23,000,000 punitive damage award in the court below. We will conduct a de novo review of the record and a constitutional analysis of the punitive damage award to determine whether the punitive damages awarded by the jury in this case violated either procedural or substantive due process. In so doing we will first provide a summary of the United States Supreme Court cases which have developed the modern analysis of punitive damages under the Due Process Clause of the Fourteenth Amendment to the Constitution.

### Development of Constitutional Analysis

Under modern constitutional theory, it is acknowledged that states have broad discretion regarding the imposition of criminal penalties and punitive damages. However, the Due Process Clause of the Fourteenth Amendment to the United States Constitution imposes limits on that discretion. The rationale is that where an award is grossly excessive, it furthers no legitimate state purpose and constitutes an arbitrary deprivation of property. *See Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032 (1991). *Haslip* involved the city's

misappropriation of its employees' health insurance funds by a city agent. It established the framework for addressing *procedural* due process. There, the Court examined Alabama's law on punitive damages and determined that it comported with the procedural limitations in the Due Process Clause where its purposes for the imposition of punitive damages were (1) retribution and (2) deterrence.

The Court further found that the jury instructions and Alabama's post-trial scrutiny procedure, by the trial court and by the Alabama Supreme Court, assured that the jury's discretion was constrained to the severity of the offense, and the stated purposes were served without grossly excessive awards. The $1,040,000 award in *Haslip* was interpreted as $840,000 in punitive damages and $200,000 in compensatory damages, a ratio slightly above 4:1. The Court intimated that there could be substantive due process limitations as well and stated that the 4:1 ratio (with a 200:1 ratio for actual out-of- pocket expenses for plaintiffs) might be close to the line. However, the Court said there was no mathematical bright line for establishing excessiveness and allowed the award to stand because it did not lack objective criteria.

Two years later, in *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 113 S.Ct. 2711 (1993), a case involving mineral rights fraud, the Court addressed *substantive* due process limitations on punitive damage awards. There, the jury awarded the defrauded company (Alliance) $10,000,000 in punitive damages and $19,000 for actual harm. The court also considered the $1,000,000 of harm that *could have occurred to the victims* if the plan had succeeded. Thus, the ratio in *TXO* has been expressed as 526:1 (for actual harm) and also as 10:1 (for potential harm). *See BMW*, 517 U.S. 559. The United States

Supreme Court in *TXO* granted certiorari to determine whether the Due Process Clause was violated because the amount was excessive or because it was a product of unfair procedure. The result was a plurality opinion, with three justices in full agreement on the decision to affirm; three justices concurring and agreeing to uphold the lower court; and three justices dissenting. The decision is much cited because the dissenting justices agreed with the analysis and the rationale of the decision, but not the holding.

*TXO* is also important because all agreed that the Due Process Clause of the Fourteenth Amendment imposed *substantive* limitations on the amount of punitive damages a state could award. The standard announced was that the award could not be so "grossly excessive" as to violate the Due Process Clause. *TXO*, 509 U.S. at 458. However, the Court reiterated the *Haslip* pronouncement that there was no rigid formula or mathematical bright line to establish excessiveness, just a general concern of reasonableness. The *TXO* Court also said that it was appropriate to consider the *potential harm* to the victim as well as possible harm to other victims in the future if the behavior was not deterred. The Court noted that the $10,000,000 punitive damage award there was dwarfed by the potential income that Alliance would have realized if TXO had performed in good faith. The Court established four factors for determining excessiveness: (1) the amount of money potentially at stake; (2) the bad faith of the offender; (3) whether there was a larger pattern of fraud, trickery, and deceit; and (4) the wealth of the offender. The Court dismissed the disparity between the $10,000,000 punitive and the $19,000 actual damage awards in light of the potential harm to the victims and TXO's bad faith, pattern of fraud, and considerable wealth.

Next, in *Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415, 114 S.Ct. 2331 (1994), involving personal injury and product liability for a three-wheeler accident, the Court returned to procedural due process. There, the jury had awarded $5,000,000 in punitive and $919,390.39 in compensatory damages. The compensatory damage award had been reduced by 20%, to $735,512.31, for the plaintiff's fault in the accident, but the punitive damage award was not reduced. The final ratio was almost 7:1. The U.S. Supreme Court found that Oregon's procedural framework, which prohibited judicial review of the jury's award unless the court could say there was no evidence to support the verdict, as violative of due process because it removed the minimum protections required to prevent unreasonable jury verdicts:

> Punitive damages pose an acute danger of arbitrary deprivation of property. Jury instructions typically leave the jury with wide discretion in choosing amounts, and the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences. Judicial review of the amount awarded was one of the few procedural safeguards which the common law provided against that danger. Oregon has removed that safeguard without providing any substitute procedure and without any indication that the danger of arbitrary awards has in any way subsided over time. For these reasons, we hold that Oregon's denial of judicial review of the size of punitive damages awards violates the Due Process Clause of the Fourteenth Amendment.

*Id*. at 432.

While the Court was focused on procedural due process and limited its discussions accordingly, it was clear that the Court found the Due Process Clause to impose a substantive limit on the size of punitive awards as well.

However, again, the Court articulated that there were no absolutes and no mathematical bright lines in determining excessiveness.

In *BMW*, 517 U.S. 559, in 1996, the dealer failed to disclose pre-delivery damages and repainting of a new car, resulting in a $4,000,000 punitive award and a $4,000 compensatory award by an Alabama jury. The Court ruled that the punitive award was grossly excessive and substantively violated the Due Process Clause of the Fourteenth Amendment, even though the punitive award had been reduced to $2,000,000 by the Alabama Supreme Court. The Court endorsed the *TXO* standard for excessiveness, stating:

> Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition. In our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case. Most States that authorize exemplary damages afford the jury similar latitude, requiring only that the damages awarded be reasonably necessary to vindicate the State's legitimate interests in punishment and deterrence. Only when an award can fairly be categorized as "grossly excessive" in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment.

*BMW*, 517 U.S. at 568 (citations omitted).

The Court found that due process requires fair notice to the defendant of (1) the conduct that is punishable and (2) the severity of the penalty that the state may impose for that conduct. It also established three guideposts for determining whether an award is "grossly excessive": (1) the degree of reprehensibility of the misconduct; (2) the ratio, or disparity between the punitive award and the harm, or potential harm, suffered by the plaintiff; and (3) the

difference between this remedy and the civil penalties authorized or imposed in comparable cases. *Id*. at 575-85.

The Court articulated that the most important factor is reprehensibility, and it discussed aggravating factors that were not present there. As to ratio, the Court found that there was not a reasonable relationship between the punitive and compensatory awards and that the 500:1 ratio was too high. Finally, under sanctions for comparable misconduct, it found that the $2,000,000 punitive award was substantially greater than Alabama's $2,000 civil penalty for deceptive trade practices, or other state's $5,000–$10,000 penalties for the same conduct. While holding fast to its no-bright-line position, the Court found the award unconstitutional, reversed the judgment, and remanded the case for further proceedings.

In *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513 (2003), a case involving bad faith, fraud, and infliction of emotional distress, the Court held that a punitive damage award of $145,000,000, with $1,000,000 in compensatory damages, was excessive and violative of the Due Process Clause. The Court upheld the three *BMW* guideposts, finding that the reasonableness goal focusing on reprehensibility was still the most important and required a *subjective* focus on the jury's actions, its reasons, the evidence before it, the facts it found, and its overall justification for the award. In evaluating reprehensibility, the Court re-urged the primary factors from *BMW*, instructing courts to consider whether

> [1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated

actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id*. at 419. The Court found that the Utah Supreme Court had punished State Farm for out-of-state conduct and conduct dissimilar to the harm inflicted on the Campbells, due to extensive, unrelated testimony regarding State Farm's policy of corrupting its employees and a nationwide adjusting policy. The Court articulated that the reprehensibility guidepost does not permit a court to expand the scope of the case to punish a defendant for "any malfeasance" committed over a 20-year period. *Id*. at 424. Nor can a state "punish a defendant for conduct that may have been lawful [in another state] where it occurred." *Id*. at 421.

The Court further articulated that the proportionality goal, focusing on the second and third guideposts, ratio and comparison, supplied the *objective* component to the excessiveness analysis of a punitive damage award. As to ratio, the Court reiterated its reluctance to identify concrete constitutional limits and again eschewed a bright line ratio. The Court did, however, state that a single digit ratio was more likely to satisfy due process than a 500:1 or a 145:1 ratio. Where the Campbells were awarded compensatory damages of $1,000,000 for a year and a half of emotional distress, and the harm had arisen from a transaction in the economic realm, and there were no physical injuries or trauma, the Court thought the compensatory damages were probably based on a component which was duplicated in the punitive award. The Court believed that much of the distress was caused by humiliation the Campbells suffered due to the actions of their insurer, then stated, "Compensatory damages, however, already contain this punitive element. *See* Restatement (Second) of Torts § 908, Comment *c*, p. 466 (1977)[.]" *Id*. at 426.

Under guidepost three, comparable penalties, the court found that Utah's statute for fraud imposed only $10,000 per incident, "an amount dwarfed by the $145 million punitive damages award." *Id*. at 428. Ultimately, the judgment was reversed and the case remanded.

In *Phillip Morris USA v. Williams*, 549 U.S. 346, 127 S.Ct. 1057 (2007), involving the death of a heavy smoker by lung cancer who had been led to believe that smoking was safe, the jury awarded $79,500,000 in punitive damages and $821,000 in compensatory damages, a ratio of almost 100:1. The majority did not rule on excessiveness but returned to the factor of *potential harm* and found that the Oregon Supreme Court had applied the wrong standard. The Court found that the Oregon award amounted to a taking of property from the defendant without due process because it punished Phillip Morris for harm to *non-party victims* whom the defendant had no opportunity to defend against and no means to discern what the non-parties knew or upon what they relied. Thus, the court vacated the judgment and remanded the case (Justices Stevens, Thomas, Ginsburg, and Scalia dissented).

Importantly, the majority in *Williams* clarified in this case the proper application of the "harm or *potential harm* factor," making it clear that the potential harm considered was "***harm potentially caused the plaintiff***." *Id*. at 354. The Court referenced its statement in *State Farm*: "[W]e have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, *to the plaintiff* and the punitive damages award." *Id*. (alteration in original). The Court further referenced its plurality opinion in *TXO* using the same kind of comparison as a basis for finding a punitive award not unconstitutionally excessive. The Court further explained:

Respondent argues that she is free to show harm to other victims because it is relevant to a different part of the punitive damages constitutional equation, namely, reprehensibility. That is to say, harm to others shows more reprehensible conduct. Philip Morris, in turn, does not deny that a plaintiff may show harm to others in order to demonstrate reprehensibility. Nor do we. ***Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible***—although counsel may argue in a particular case that conduct resulting in no harm to others nonetheless posed a grave risk to the public, or the converse. Yet for the reasons given above, a ***jury may not go further than this and use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties.***

*Williams*, 549 U.S. at 355 (emphases added).

In *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 128 S.Ct. 2605, (2008), an oil spill case, the punitive damage award was $4.5 billion, reduced to $2.5 billion, and the compensatory damage award was $507.5 million. There, the Court discussed the upper limits for punitive damage awards in maritime cases of that type, acknowledging that the inquiry was very specific to the facts of that case. The Court articulated that its effort to find such a limit was relevant only to cases "with no earmarks of exceptional blameworthiness within the punishable spectrum . . . and cases . . . without the modest economic harm or odds of detection that have opened the door to higher awards." *Id.* at 513. Based upon the facts in *Exxon*, where the damage was economic and involved an accidental running aground by a tanker, the Court ultimately arrived at a 1:1 ratio but discussed higher awards, distinguishing itself from cases that involve egregious conduct and dangerous activity "carried on for the purpose of increasing a tortfeasor's financial gain." *Id.* at 510. By comparison, the *Exxon* Court said, "We confront, instead, a case of

reckless action, profitless to the tortfeasor, resulting in substantial recovery for substantial injury." *Id*. at 510-11.

We now turn to the constitutional analysis of the punitive damage award in this case.

***Procedural Due Process***

Teleflex does not challenge Louisiana's purposes of punishment and deterrence, which are identical to those approved repeatedly by the U.S. Supreme Court. Nor does Teleflex object to the trial court's jury instructions on punitive damages; in fact, at the hearing on Teleflex's JNOV, Teleflex stated that the jury was properly instructed and charged on punitive damages at trial. Rather, Teleflex asserts that the trial court in this case refused to review the jury's award and that lack of judicial review is a constitutional violation pursuant to *Haslip*, 499 U.S. 1, whose procedural requirements we have already discussed above. In bringing this contention, Teleflex references the trial court's statement that where reasonable minds could differ, he was not going to disturb the jury's verdict. What Teleflex fails to include is that this statement arose at the hearing on Teleflex's request for JNOV or remittitur on the punitive damage award. The hearing itself was a judicial review by the trial court, and the trial judge's reference to reasonable minds differing is the standard for denying a motion for JNOV. In *TXO*, the Court stated:

> The only basis for criticizing the trial judge's review of the punitive damages award is that he did not articulate his reasons for upholding it. He did, however, give counsel an adequate hearing on TXO's postverdict motions, and during one colloquy indicated his agreement with the jury's appraisal of the egregious character of the conduct of TXO's executives. While it is always helpful for trial judges to explain the basis for

57

> their rulings as thoroughly as is consistent with the efficient dispatch of their duties, we certainly are not prepared to characterize the trial judge's failure to articulate the basis for his denial of the motions for judgment notwithstanding the verdict and for remittitur as a constitutional violation.

*TXO*, 509 U.S. at 464-65 (citation omitted).

We find accordingly because the trial court in this case was very similarly vocal during the hearing about Teleflex's knowledge of the magnitude of the risk, the foreseeability of the boat being used by someone who was not given a manual, and Teleflex's egregious conduct in still refusing to warn that a small loss of fluid would result in total loss of steering that could result in ejection and death. When Teleflex indicated at the hearing that it would have had to anticipate a more specific fact pattern than was reasonable, the trial court disagreed and reviewed the evidence showing that Teleflex did in fact anticipate the loss of steering control when oil leaked out because of the testing in 1989:

> THE COURT:
>
> Here is the scenario as I see it. I think it was Mr. Fetchko. He's the designer of this thing; right?
>
> MR. FROHN:
>
> Right.
>
> THE COURT:
>
> My recollection is that he or someone under his direction did these tests of the different orientations. He was aware of the potential to lose steering altogether and at certain levels, depending upon what [the] orientation was. And, he was fully aware of what the consequences would be if you lost control and the boat happened to be up on plane. Is that a fair statement?
>
> MR. FROHN:
>
> I think that's a fair statement.

. . . .

THE COURT:

Mr. Frohn, I don't think we can say that they didn't think about it. I think the testing made them aware that there was this risk that if you -- they tested it to see what was going on.

MR. FROHN:

Right, right.

THE COURT:

Because they were aware that oil leaks out.

The hearing transcript reveals that after hearing and considering full argument on the *Exxon* case and ANSI standards, the trial court looked at the evidence and expressed its reasons for finding that it should not overturn the jury's verdict, implicitly finding Teleflex's conduct reckless and callous:

THE COURT:

So, there is nothing in this warning that tells you that, if you're losing steering fluid, it's going to take more than two turns to get you to full left or right. There's nothing in this instruction that tells you clicking might make a difference. There is nothing in this instruction, or warning I should say, that talks about leaking fluid. It says, "Install and maintain in accordance with Teleflex instructions. Use approved oil. Do not use brake fluid." It doesn't say anything about, if you've got a leak, you know, go check the level. . . .

. . . .

And, the issue for me and for the jury is was your warning sufficient to – you know, this is a standard, but that's a reasonable standard. Whether you think it applies or not, it's entirely reasonable that you would anticipate that a manufacturer that's going to put into the stream of commerce a product that has the potential to kill somebody would tell somebody that this product has

59

a potential to kill you if you don't do this or if this happens. And, I think this jury looked at that . . . .

. . . .

I do not think this is a judgment that I can reverse or change. I think it was reasonably made based upon the evidence that was presented.

Accordingly, Teleflex's argument that it did not receive judicial review in violation of procedural due process requirements has no merit.

## *Substantive Due Process*

The Court established three guideposts in *BMW*, 517 U.S. 559, for determining the excessiveness of punitive damage awards.

### *Degree of Reprehensibility*

The United States Supreme Court in the cases discussed above repeatedly stated that reprehensibility is the most important factor in the constitutional analysis. In *Exxon*, where the running aground of the tanker was inadvertent, the Court stated that an action taken or omitted "in order to augment profit represents an enhanced degree of punishable culpability." *Exxon*, 554 U.S at 494. As we discussed, the jury in this case found Teleflex's conduct in failing to warn of an unknown and inherently dangerous condition that became deadly with a few drops of oil loss to show a reckless and callous disregard for the safety of its users. This is particularly egregious conduct where Teleflex alone had this knowledge in 1989, and where the cost of avoiding the risk was a thirty-cent label on the system itself.

The jury heard the designer of the SeaStar system trivialize the duty to warn of this life-threatening risk by comparing it to open and obvious risks such as

slamming one's hand in a car door or falling out of the sky if an airplane's motor fails. The jury also heard Mr. Fetchko say that to provide a real warning about loss of steering, ejection, and possible death after only a very minor loss of oil would cause "mass hysteria," which Teleflex did not want to do. He admitted that Teleflex wanted to dominate the market of boating industry steering systems with its hydraulic design and that it was very successful in doing so.

Additionally, while there was no actual evidence of other deaths before the jury, the jurors heard Mr. Fetchko quickly retract a statement that this was the only incident of its kind. This came after admitting that there were thousands of complaints about hydraulic fluid loss, and that this frequency was too small to justify a warning when put in the correct context that Teleflex sold millions of the systems. The jury implicitly found callousness in making frequency the determinative factor in placing a simple, inexpensive, but life-saving warning on a product where loss of life was the consequence.

The *BMW* and *State Farm/Campbell* aggravating factors for evaluating reprehensibility were satisfied: the harm here was physical, not economic, and of the worst kind, as it encompassed the violent taking of the life of a promising young man of twenty-two; the evidence before the jury showed tortious conduct evincing indifference and reckless disregard for the safety of others; the target of the conduct may not have been financial vulnerability, but the evidence clearly indicated a vulnerability through inexperience with regard to the users who buy this product. Further, given the thousands of complaints about oil loss, the decision not to warn was made repeatedly; and while the conduct may not equate with trickery, the decision not to warn was intentional for the purpose of

avoiding "mass hysteria," which would of course reduce profits. Thus, the profit motive was established.

Moreover, in *Exxon*, 554 U.S. 471, the Court found that hard-to-detect wrongdoing, which is more reprehensible, subjects the more culpable tortfeasor to greater punishment. It is viewed as concealment and bad faith when a company has knowledge through its own testing that its product is dangerous and still withholds the knowledge from those who purchase the product and create the very wealth the defendant enjoys. *See id*.

We find that the reprehensibility factor is fully realized in this case, unlike most of the seminal cases decided by the U.S. Supreme Court as outlined above. Accordingly, the reprehensibility factor in this case weighs heavily in favor of sustaining a high punitive damage award.

*Ratio*

The objective component of the analysis in this case, the ratio of the $23,000,000.00 punitive damage award as compared to the $125,000 compensatory damage award, is 184:1, without considering the potential harm factor of the *BMW* analysis; but is less than 3:1 when potential harm is included in the calculus. Derek's death was violent but mercifully he died fairly quickly. The propeller blades cut him deeply from his beltline to his head. The jury awarded $100,000 to Mr. Warren for Derek's survival damages. His mother had settled before trial, and thus her loss was not before the jury. Because Derek was not raised by his father, the jury awarded Mr. Warren only $25,000 for his wrongful death loss. The compensatory awards were, therefore, unusually low and likely

difficult for the jury, but the small awards clearly indicate that the jury was not influenced by "passion or prejudice." *Exxon*, 554 U.S. at 503.

Teleflex asserts that the ratio is impermissibly high for maritime cases and points to *Exxon* which limited the punitive award to a 1:1 ratio. Teleflex further asserts that the ratio violates the Due Process Clause as an excessive punitive award. However, the jurisprudence from the U.S. Supreme Court which shows the development of the constitutional analysis from *Haslip* in 1991 to *Exxon* in 2008 has repeatedly adhered to its position that there is no bright line mathematical formula for determining what is "grossly excessive" under the facts of any case.

The Court in *Exxon* repeatedly narrowed its findings to the facts in that case where the harm was economic loss, the conduct was unintentional and inadvertent, there was no motive for financial gain, and the compensatory damages were substantial at $507,500,000. It also involved a shipowner's liability, the Clean Water Act, and regulatory sanctions. The Court poignantly noted that Exxon had already paid millions in clean-up costs, and distinguished *Exxon* from cases involving a tortfeasor's egregious conduct and a motive for gain. Its opinion was again consistent with its prior holdings:

> Of course, we have *consistently rejected the notion that the constitutional line is marked by a simple mathematical formula*, even one that compares actual *and potential* damages to the punitive award. *TXO*, 509 U.S. at 458, 113 S.Ct. at 2720. Indeed, *low awards of compensatory damages may properly support a higher ratio than high compensatory awards*, *if*, for example, a *particularly egregious act has resulted in only a small amount of economic damages*. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine. It is appropriate, therefore, to reiterate our rejection of a categorical approach. Once

again, "we return to what we said ... in *Haslip:* 'We need not, and indeed *we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every c*ase. We can say, however, that [a] general concer[n] of reasonableness ... properly enter[s] into the constitutional calculus.'" *Id.* at 458, 113 S.Ct. at 2720 (quoting *Haslip*, 499 U.S. at 18, 111 S.Ct. at 1043).

*BMW*, 517 U.S. at 582-83 (emphasis added) (alteration in original).

Maritime cases following *Exxon* have also held that *Exxon's* ratio of 1:1 was limited to the facts in that case.

In *Clausen v. Icicle Seafoods, Inc.*, 174 Wash.2d 70, 272 P.3d 827 (2012), *cert. denied*, ___ U.S. ___, 133 S.Ct. 199, a case involving the employer's withholding of maintenance and cure to the severe detriment of an injured seaman, the court disagreed with the defendant's reading of the scope of the *Exxon* case as imposing a 1:1 ratio in all maritime cases:

We find nothing in the *Exxon* case establishing a general rule limiting the jury's role in determining appropriate damages. The *Exxon* case cannot be read as establishing a broad, general rule limiting punitive damage awards, primarily because nowhere in the opinion can such a rule be found. To the contrary, the United States Supreme Court expressly limits its holding to the facts presented. In the first paragraph of the opinion, the issue is framed as "whether the award ... *in this case* is greater than maritime law should allow *in the circumstances.*" *Exxon*, 554 U.S. at 476, 128 S.Ct. 2605 (emphasis added).

*Id*. at 835.

The *Clausen* jury awarded punitive damages of $1,300,000 and compensatory damages of $37,420, a ratio of almost 35:1. After trial, however, the trial judge awarded attorney fees of $387,558 for the employer's misconduct in withholding maintenance and cure. The Washington Supreme Court found the attorney fees to be compensatory. It also upheld the punitive damage award of

$1,300,000 for callous, willful, or wanton withholding of maintenance and cure as proper, and, as necessary as a deterrent. The court found the awards not duplicative in nature and cited other cases which included the attorney fees as part of the compensatory award when considering the punitive damages award ratio. When the attorney fees were added to the jury's compensatory damage award, the ratio of punitive to compensatory became 3:1.

The *Clausen* court found that, unlike the conduct of *Exxon*, the conduct of the employer, Icicle, was more than reprehensible; it was egregious. The court discussed its rationale for a variable punitive damage award that is not bound to a ratio from another case with different facts:

> The availability of punitive damages, without a 1:1 ratio to compensatory damages, for willful withholding of maintenance and cure is necessary because it also serves as a *deterrent*. A *variable punitive damages award creates a disincentive* to employers who would otherwise prefer to hold out on paying maintenance and cure until a suit is filed, if at all.

*Id*. at 836 (emphasis added).

In *McWilliams v. Exxon Mobile Corp*., 12-1288 (La.App. 3 Cir. 4/3/13), 111 So.3d 564, *writ denied*, 13-1402 (La. 11/8/13), 125 So.3d 451, a maritime and Jones Act case involving a worker's exposure to benzene resulting in leukemia, the jury awarded $5,498,391 in compensatory damages and $12,000,000 in punitive damages. This court agreed with the *Clausen* analysis of *Exxon*, finding that the Supreme Court did not therein establish a general rule pertaining to punitive damages, "but rather, [it] narrowly tailored that result to the unique case before it." *Id*. at 579. In *McWilliams*, after the punitive award was affirmed, and the compensatory award was reduced by $244,909 (future and past medical expense reductions), the resulting ratio was approximately 2.3:1.

65

In both *Clausen* and *McWilliams*, the maritime workers were severely injured by the defendants' conduct, but they lived and were awarded compensatory damages for medical expenses and lost earnings, and in *Clausen* that included substantial attorney fees. Mr. Warren cites cases suggesting that, if Derek had survived his injuries, his potential damages would easily have been in the millions. Teleflex argues that potential harm is not an appropriate consideration in a maritime case because the factor was omitted from the *Exxon* decision, but Teleflex fails to cite any case finding that potential harm is forbidden in maritime cases. The second *BMW* guidepost clearly states that the ratio factor considers the disparity between the punitive award and the *harm **or potential harm*** suffered by the plaintiff. The *BMW* Court referenced its decision in *TXO*:

> In *Haslip* we concluded that even though a punitive damages award of "more than 4 times the amount of compensatory damages" might be "close to the line," it did not "cross the line into the area of constitutional impropriety." 499 U.S. at 23–24, 111 S.Ct. at 1046. *TXO*, following dicta in *Haslip*, refined this analysis by confirming that the proper inquiry is "'whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred.'" *TXO*, 509 U.S. at 460, 113 S.Ct., at 2721 (emphasis in original), quoting *Haslip*, 499 U.S. at 21, 111 S.Ct. at 1045. Thus, in upholding the $10 million award in *TXO*, we relied on the difference between that figure and the harm to the victim that would have ensued if the tortious plan had succeeded. That difference suggested that the relevant ratio was not more than 10 to 1.

*BMW*, 517 U.S. at 581. In explaining the 10:1 ratio, the Court indicated in a footnote that the lowest amount of potential harm in *TXO* would have been $1,000,000. *Id*. at 581 n.34.

In this case, the potential harm to Derek, had he lived and suffered amputation or severe disability, could reasonably have exceeded $10,000,000. *See Soileau v. Smith True Value & Rental*, 11-1594 (La.App. 3 Cir. 1/30/14), 130 So.3d 1060, *writ denied*, 14-435 (La. 4/17/14), 138 So.3d 627, where compensatory damages of $9,429,758 (including $7,500,000 in general damages) were awarded to a plaintiff whose right leg was shattered resulting in permanent disability. *See also Forbes v. Cockerham*, 05-1838 (La.App. 1 Cir. 3/7/08), 985 So.2d 86, *rev'd allocation of fault against DOTD*, 08-762 (La. 1/21/09), 5 So.3d 839, awarding $10,800,00 in general damages to a child for traumatic amputation of his left arm and fractures of the legs and ankles; *and see Netecke v. State ex rel. Dep't of Transp. & Dev.*, 97-974 (La.App. 3 Cir. 4/1/98), 715 So.2d 439, *rev'd allocation of fault against DOTD*, 98-1182 (La. 10/19/99), 747 So.2d 489, awarding $7,944,200 for a plaintiff who suffered a partial leg amputation and other injuries.

In considering the potential harm, even at $8,000,000, the resulting ratio is 2.8:1, a number within even *Exxon's* generalized upper limits, and well below the due process requirements discussed by the Supreme Court in the constitutional analyses outlined above. Accordingly, the jury's verdict on punitive damages is supported under the ratio analysis as well as the reprehensibility analysis, the two most important factors to be considered.

Further, under *TXO* and under Louisiana law the wealth of the defendant is a factor in determining an amount that would deter future commission of the same actions and misconduct. *See Mosing*, 830 So.2d 967; *see also Rachal*, 111 So.3d 1137. We note in this case, where Eric Fetchko affirmed that Teleflex's worth in 2013 was over $4 billion, the punitive damage award of $23,000,000

represents only 1/174 of the company's worth. We now turn to the third *BMW* guidepost.

*Comparable Penalties*

The final guidepost requires a comparison of the punitive damages award to the civil or criminal penalties that could be imposed for comparable misconduct. *BMW*, 517 U.S. 559. We can think of no statutes or codal authority that impose monetary civil or criminal penalties for the deprivation of life that occurred in this case. Some courts interpret this guidepost as calling for a comparison with other punitive damage awards in order to satisfy the requirement that the tortfeasor receive "fair notice" that his wrongful conduct could entail a substantial punitive award when "penalties for comparable conduct are middling." *Lee v. Edwards*, 101 F.3d 805, 811 (2d Cir. 1996). In *Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521 (Tenn. 2008), *cert denied*, 556 U.S. 1257, 129 S.Ct. 2433 (2009), a product liability case, the plaintiffs were awarded $13,367,345 in punitive damages for the wrongful death of a child, and the mother was awarded $6,632,655 in punitive damages on her negligent infliction of emotional distress claim. There was no negligent infliction of emotional distress claim in this case, and the compensatory damages were nominal. By contrast, the compensatory damages in *Flax* were $7,500,000; thus, the total award was approximately $27,000,000. As repeatedly indicated by the Supreme Court above, higher punitive damages are often warranted in cases involving nominal compensatory damages. Accordingly, comparable cases demonstrate that the award here is reasonable.

For all of the reasons expressed above, we find that the punitive damages awarded by the jury in this case do not violate constitutional due process under the guideposts articulated in *BMW*, nor are they excessive under the reasoning of *Exxon*. Accordingly, we affirm the judgments of the trial court in all respects on the issues raised in appeal number 15-1113.

### *APPEAL NUMBER 15-838*

Finally, we address the trial court's decision to partially grant Mr. Warren's motion for JNOV and award him prejudgment interest on compensatory damages, but deny the portion of the JNOV that sought prejudgment interest on punitive damages. Mr. Warren appeals the judgment insofar as it denied prejudgment interest on the punitive damages. Teleflex argues on appeal that prejudgment interest is not allowed on either the compensatory or the punitive damages. We conclude that Mr. Warren is entitled to prejudgment interest on compensatory damages from the date of judicial demand, but is not entitled to prejudgment interest on the award of punitive damages.

### *Applicable Law and Standard of Review*

As previously discussed, because this case involves a watercraft collision on navigable waters, it falls within the domain of general federal maritime law. *Yamaha Motor Corp.*, 516 U.S. 199. When a state court exercises jurisdiction over maritime claims, that court is generally "bound to apply *substantive* federal maritime statutory law and to follow United States Supreme Court maritime jurisprudence." *Milstead v. Diamond M Offshore, Inc.*, 95-2446, p. 7 (La. 7/2/96), 676 So.2d 89, 94 (emphasis added). A law is "substantive" if it "establishes new rules, rights and duties or changes existing ones." *Id.* at 95. "On

69

matters of procedure, however, the state court is generally free to follow the state's own rules." *Lejano v. Bandak*, 97-388, p. 7 (La. 12/12/97), 705 So.2d 158, 163, *cert. denied*, 525 U.S. 815 (1998). "A 'procedural law' is one that prescribes a method for enforcing a substantive right and relates to the form of the proceeding or the operation of the laws." *Milstead*, 676 So.2d at 95.

The question of the applicable standard of review is procedural, and it is governed by Louisiana law. *Id.* In this case, both parties seek review of the trial court's judgment partially granting and partially denying Mr. Warren's motion for JNOV on the issue of prejudgment interest. Normally, in reviewing a JNOV, an appellate court must determine whether "the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict." *Anderson v. New Orleans Pub. Serv., Inc.*, 583 So.2d 829, 832 (La.1991). This is because a JNOV "should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions[.]" *Id.* Yet, in this case, on the matter of prejudgment interest, there was no evidence presented; there were no facts or inferences that pointed in favor of either party. Since the appropriateness of a JNOV is dependent on a jury's findings of fact, and there was none in this case, a motion for JNOV was the incorrect procedural device to use here. Accordingly, we decline to use the traditional standard of review for a JNOV to address the legal questions raised by the parties. Instead, we shall focus on the substance, not the form, of Mr. Warren's motion, which raised purely legal issues. Questions of law are reviewed de novo. *Wooley*, 61 So.3d 507. Since the trial court here ruled solely on legal questions, we review the trial court's judgment de novo.

***Prejudgment Interest on Compensatory Damages***

We first address Teleflex's argument that the trial court should not have awarded Mr. Warren prejudgment interest on compensatory damages because the issue of interest was never submitted to the jury. Teleflex claims that prejudgment interest is an issue of fact that, in a jury trial, must be decided by the jury; when Mr. Warren failed to submit the question of interest to the jury, the court was precluded from awarding it. We find, however, that the applicable law permitted the trial court to grant prejudgment interest on compensatory damages.

The issue of prejudgment interest is substantive, so this court must first look to federal maritime law. *Milstead*, 676 So.2d 89. In general, prejudgment interest on damages awarded in maritime cases is granted from the date of loss. *Mayo v. Nissan Motor Corp. in U.S.A.*, 93-852 (La.App. 3 Cir. 6/22/94), 639 So.2d 773, *determination sustained*, 94-1990 (La. 11/11/94), 644 So.2d 661. The trial court has some discretion to deny prejudgment interest, but "only when there are 'peculiar circumstances' that would make it inequitable for the losing party to be forced to pay prejudgment interest." *Noritake Co., Inc. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. 1980). Teleflex does not claim that there were any such "peculiar circumstances" here. Rather, Teleflex claims that the trial court made a procedural error by granting prejudgment interest when that issue was not considered by the jury. Since this concerns the method for enforcing a party's right to prejudgment interest, Louisiana procedural law applies. *See Milstead*, 676 So.2d 89.

Teleflex asserts that Louisiana law requires the issue of prejudgment interest in a jury trial to be submitted to the jury; if not, it cannot be awarded by the judge. Teleflex relies on *Ellender v. Texaco, Inc.*, 425 So.2d 291 (La.App. 3 Cir.

1982), and *Morris v. Schlumberger, Ltd.*, 436 So.2d 1178 (La.App. 3 Cir. 1983), *writ denied*, 441 So.2d 1221 (La.1983), where this court affirmed the decisions of the trial courts to deny prejudgment interest when that issue had not been submitted to the jury. However, neither of those cases was based on Louisiana procedural law, but instead on *Havis v. Petroleum Helicopters, Inc.*, 664 F.2d 54 (5th Cir. 1981). The Fifth Circuit in *Havis* did not cite Louisiana law either; rather, that court based its decision to deny prejudgment interest on *Robinson v. Pocahontas, Inc.*, 477 F.2d 1048 (1st Cir. 1973). The First Circuit, naturally, did not rely on Louisiana law in *Robinson*.

The procedural law of Louisiana is of overriding importance here because La.Code Civ.P. art. 1812(A) states (emphasis added):

> The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event, the court may submit to the jury written questions susceptible of categorical or other brief answer, or may submit written forms of the several special findings which might properly be made under the pleadings and evidence, or may use any other appropriate method of submitting the issues and requiring the written findings thereon. The court shall give to the jury such explanation and instruction concerning the matter submitted as may be necessary to enable the jury to make its findings upon each issue. *If the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue omitted unless, before the jury retires, he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding*, or if it fails to do so, it shall be presumed to have made a finding in accord with the judgment on the special verdict.

The plain language of the La.Code Civ.P. art. 1812(A) gives the trial judge in a jury trial the discretion to rule on the issue of prejudgment interest when that issue was raised by the pleadings, but not submitted to the jury. In this case, Mr. Warren

raised the issue of interest in his original and amended petitions. The trial judge required the jury to return a special verdict form, but neither Mr. Warren nor Teleflex asked that the issue of prejudgment interest be submitted to the jury. Under La.Code Civ.P. art. 1812(A), the parties waived their right to have the issue of prejudgment interest decided by the jury, and, therefore, it was within the authority of the trial judge to award prejudgment interest. We determine that trial judge's award of prejudgment interest on compensatory damages in this case must stand.[7]

### *Prejudgment Interest on Punitive Damages*

We next address Mr. Warren's argument that the trial judge erred in denying the portion of his motion for JNOV requesting prejudgment interest on punitive damages. Mr. Warren argues that there is no reason to deviate from the general rule allowing prejudgment interest on awards in maritime cases when it comes to punitive damages. After reviewing the relevant jurisprudence on prejudgment interest, however, we find that the law does not allow Mr. Warren to recover prejudgment interest on the award of punitive damages.

Once again, on the substantive issue of prejudgment interest, this court must first look to federal maritime law. *Milstead*, 676 So.2d 89. And again, we note that prejudgment interest on damages awarded under general maritime law is generally allocated from the date of loss. *Mayo*, 639 So.2d 773. However, we could not find any federal statute, nor any state or federal jurisprudence, directly authorizing prejudgment interest on punitive damages awarded under general

---

[7]The trial court award grants prejudgment interest on compensatory damages "from the date of judicial demand until paid." Generally, prejudgment interest on damages in maritime cases is awarded from the date of loss. *Mayo*, 639 So.2d 773. However, this issue was not raised by Mr. Warren in his motion for JNOV or on appeal, and we decline to address it now.

maritime law. On the other hand, several cases have cast doubt on the proposition that federal maritime law permits prejudgment interest on punitive damages. *See e.g. McPhillamy v. Brown & Root, Inc.*, 810 F.2d 529 (5th Cir. 1987) (noting that while the court did not need to decide if the plaintiff was entitled to prejudgment interest on punitive damages, it was "at least highly doubtful" that he would have been able to so recover); *In re P & E Boat Rentals, Inc.*, No. 83-690, 1987 WL 5987 (E.D. La. Jan. 23, 1987), *rev'd on other grounds*, 872 F.2d 642 (5th Cir. 1989) (finding that prejudgment interest was not permitted on the punitive damages portion of a jury award to plaintiffs in an admiralty and maritime action); *Jordan v. Intercontinental Bulktank Corp.*, 621 So.2d 1141, 1158 (La.App. 1 Cir. 1993), *writs denied*, 623 So.2d 1335, 1336 (La.1993), *cert. denied*, 510 U.S. 1094, 114 S.Ct. 926 (1994) (holding that an injured seaman could recover interest on punitive damages only from the date of judgment). There are also non-maritime cases in Louisiana state and federal courts where courts refused to award prejudgment interest on punitive damages. *See e.g. George v. Foster*, 129 F.3d 610 (5th Cir. 1997) (finding that prejudgment interest could not be awarded on punitive damages in a hostile work environment sexual harassment case); *In re New Orleans Train Car Leakage Fire Litig.*, 00-479 (La.App. 4 Cir. 6/27/01), 795 So.2d 364, *writs denied*, 01-2492, 01-2493 (La. 10/14/02), 827 So.2d 411, *cert. denied*, 538 U.S. 944, 123 S.Ct. 1623 (2003) (finding that interest on punitive damages in a tort-based class-action suit involving a leaking railroad tank car runs only from the date of judgment).

In many of these cases, the courts indicated that prejudgment interest should not be awarded on punitive damages because the rationale for prejudgment interest is at odds with the rationale for punitive damages. The purpose of

prejudgment interest is "to ensure that an injured party is fully compensated for its loss." *City of Milwaukee v. Cement Div., Nat. Gypsum Co.*, 515 U.S. 189, 195, 115 S.Ct. 2091, 2095 (1995). Prejudgment interest thereby "helps achieve the goal of restoring a party to the condition it enjoyed before the injury occurred[.]" *Id.* at 196. Punitive damages, however, "are aimed not at compensation but principally at retribution and deterring harmful conduct." *Exxon*, 554 U.S. at 492. Prejudgment interest on punitive damages, therefore, would not further the goal of ensuring a party is wholly compensated for its loss. *Ill. Cent. R. Co. v. Tex. E. Transmission Corp.*, 551 F.2d 943 (5th Cir. 1977). We find this rationale persuasive when applied to the present context. Here, the punitive damages awarded to Mr. Warren were not supposed to compensate him, but were supposed to punish Teleflex and deter it from similar harmful conduct in the future. The compensatory damages were, clearly, the award that was supposed to compensate Mr. Warren for the loss of his son. Prejudgment interest is one element of that compensation. *West Virginia v. U.S.*, 479 U.S. 305, 107 S.Ct. 702 (1987). So while prejudgment interest ought to be applied to compensatory damages, prejudgment interest should not be awarded on punitive damages, which lack any sort of compensatory function. Accordingly, we find that the trial court correctly denied Mr. Warren prejudgment interest on the award of punitive damages.

IV.

**CONCLUSION**

Pursuant to our de novo review, and for all of the reasons discussed above, we affirm the judgments granting directed verdicts to Glen Vamvoras and Daniel Vamvoras in appeal number 15-354. Likewise, finding no error and no

75

manifest error in the trial court's judgments, we affirm the trial court on all issues raised in appeal number 15-1113. Finally, we affirm the judgment of the trial court in appeal number 15-838 granting prejudgment interest on compensatory damages from the date of judicial demand and denying prejudgment interest on punitive damages.

All costs are assessed to Teleflex, Inc.

**AFFIRMED.**

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

RON WARREN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE
OF DEREK HEBERT

VERSUS

SHELTER MUTUAL INSURANCE COMPANY, ET AL.

**CONERY, J., concurs in part, dissents in part, and assigns reasons.**

I respectfully dissent from the majority's decision to affirm the trial court's ruling to grant a new trial from the first jury verdict in favor of Teleflex. I would reverse and render judgment in favor of Teleflex, dismissing all of plaintiff's claims with prejudice at his cost. This decision renders moot all remaining assignments of error. There are three separate appeals consolidated and considered together. I will discuss only the appeal in docket number 15-1113 alleging trial court error by granting a new trial from the first jury verdict finding for Teleflex and resulting in a judgment dated September 30, 2014, in its favor, dismissing all plaintiff's claims with prejudice and at plaintiff's cost, which I would propose to reinstate.

Should the trial court's and majority decision become final, I concur only with the majority decision in docket number 15-838 to affirm the trial court's decision to award prejudgment interest on compensatory damages and deny prejudgment interest on punitive damages.

# ASSIGNMENT OF ERROR NO. 2

# NEW TRIAL

Louisiana code of Civil Procedure Articles 1972 and 1973 set forth the basis upon which a new trial can be ordered.[1]  None of the mandatory grounds found in La.Code Civ.P. art. 1972 apply here.  The trial judge articulated that he granted a new trial in this case under the discretionary grounds found in La.Code Civ.P. art. 1973 in order to prevent a "miscarriage of justice."

The majority accurately quotes *Lamb v. Lamb*, 430 So.2d 51 (La.1983), as to the law generally applicable to the issue of the grant of a new trial.  However, where, as here, the jury heard all of the evidence, significant weight must be given to the jury's decision.  In *Lamb*, the supreme court set forth the well-settled standard for granting a new trial and emphasized the need to examine all of the "facts and circumstances of the individual case".

> [Louisiana Code of Civil Procedure Article] 1973 provides that the trial court may grant a new trial if there exists good grounds therefor.  A proper application of this article **necessitates an examination of the facts and circumstances of the individual case. When the trial judge is convinced by his examination of the facts** that the judgment would result in a miscarriage of justice, a new trial should be ordered.  *Deliberto v. Deliberto*, 400 So.2d 1096 (La.App.

---

[1]Louisiana Code of Civil Procedure Article 1972 provides:

A new trial shall be granted, upon contradictory motion of any party, in the following cases:

(1) When the verdict or judgment appears clearly contrary to the law and the evidence.

(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.

(3) When the jury was bribed or has behaved improperly so that impartial justice has not been done.

Louisiana Code of Civil Procedure Article 1973 provides, "A new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law."

1st Cir.1981); *Jones v. Ledet*, 383 So.2d 1308 (La.App. 3rd Cir.1980); *Shows v. Williamson*, 256 So.2d 688 (La.App. 2nd Cir.1972); *See Hardy v. Kidder*, 292 So.2d 575 (La.1973); *Succession of Robinson*, 186 La. 389, 172 So. 429 (1936).

(Emphasis added.)

Further, the first circuit has more recently stated, "the discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict." *Burris v. Walmart Stores, Inc.*, 94-0921 (La.App. 1 Cir. 3/3/95), 652 So.2d 558, 560, *writ denied*, 95-0858 (La. 5/12/95), 654 So.2d 352. The reviewing court must balance the great deference given to the jury's fact-finding role and the discretion of the trial judge in deciding whether to grant a new trial from a favorable jury verdict. *See Davis v. Wal-Mart Stores, Inc.*, 00-445 (La. 11/28/00), 774 So.2d 84. In doing so, "The scales are clearly tilted in favor of the survival of the jury's verdict, but the trial court is left with a breadth of discretion which varies with the facts and events of each case." *Id.* at 94. "**The trial record must be examined carefully** to determine if the trial court abused its discretion in deciding that the jury verdict was not supportable by '**any fair interpretation of the evidence**.'" *Campbell v. Tork, Inc.*, 03-1341, p. 5 (La. 2/20/04), 870 So.2d 968, 971 (emphasis added) (citing *Id.*).

In *Campbell v. Tork*, 870 So.2d at 971 (footnotes omitted), our supreme court articulated the standard of review to be used by an appellate court in reviewing a trial court ruling on a motion for new trial:

> The applicable standard of review in ruling on a motion for new trial is whether the trial court abused its discretion. *Martin*[ *v. Heritage Manor South Nursing Home*, []00-1023 (La.4/3/01), 784 So.2d 627, [632]]. In order to apply this standard, "we are faced with the balancing of two very important concepts: the great deference given to the jury in its fact[-]finding role and the great discretion

given to the trial court in deciding whether to grant a new trial." *Davis*, [] 774 So.2d. at 93-94. Though the "[trial] court has much discretion [in determining whether to grant a new trial], this [c]ourt will not hesitate to set aside the ruling of the trial judge in a case of manifest abuse." *Lamb v. Lamb* 430 So.2d 51 (1983). Thus, although "the scales are clearly titled in favor of the survival of the jury's verdict, the trial court is left with a breadth of discretion which varies with the facts and events of each case." *Davis*, [] 774 So.2d at 94.

Although our standard of review is relatively straight-forward, the application of this standard is more complicated. *Martin*, [] at 632. In order to enable this Court to correctly apply this standard of review, the facts and evidence presented in each case are very important. The trial record must be examined carefully to determine if the trial court abused its discretion in deciding that the jury verdict was not supportable by "any fair interpretation of the evidence." Thus, the evidence and testimony is hereafter examined in order to correctly apply our standard of review.

Thus, it is clear that it is the duty of the trial judge to review **all of the evidence** before making a decision to grant a new trial and only if the trial court finds that the jury's verdict was not supportable by any fair interpretation of the record as a whole may a new trial be granted.

In *Davis v. Wal-Mart*, our supreme court found that the "jury's verdict was supportable by a fair interpretation of the evidence" and found no good grounds for the grant of a new trial. *Id.* at 95. The court stated:

> The fact that a determination on a motion for new trial involves judicial discretion, however, does not imply that the trial court can freely interfere with any verdict with which it disagrees. **The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility.** A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light. **Thus, the jury's verdict should not be set aside if it is supportable by any fair interpretation of the evidence.**

*Id.* at 93 (emphasis added) (citations omitted).

In *Davis v. Witt*, 02-3102, p. 23 (La. 7/2/03), 851 So.2d 1119, 1134 (emphasis added), the supreme court quoted *Davis v. Walmart* throughout and reversed the trial court's grant of a new trial and reinstated the jury verdict. Finding that the evidence fully supported the jury's verdict, the supreme court stated:

> **When any fair interpretation of the evidence supports the jury's verdict, the grant of a new trial must be reversed. - - - "It is well accepted a party may not assign as error the giving or the failure to give a jury instruction unless he objected at trial**. . . . As such, we have said that the failure to object to the inclusion of a jury charge precludes a party from raising a claim[.]

Our court has further stated that "the requirement of a **simultaneous objection** would be meaningless if a party could reserve the right to register an objection until after an adverse verdict." *Pitard v. Davis*, 599 So.2d 398 (La.App. 5 Cir. 1992) (emphasis added) (citing *Mobley v. General Motors Corp.*, 482 So.2d 1056, 1061 (La.App. 3[] Cir. 1986), *writ denied*, 486 So.2d 735 (La.1986).

In *Johnson v. H.W. Parson Motors, Inc.*, 231 So.2d 73, 79 (La.App. 1 Cir. 1970), counsel did not object to the trial court making a comment about the characterization of a witness in the presence of the jury. The first circuit stated:

> We also note that no effort was made by counsel for appellants either at that stage of the trial or in conjunction with the trial court's charging of the jury to bring this matter to the attention of the trial court so that the jury could be expressly admonished to disregard the comment. We feel counsel for appellants should have made his objection before the trial court or if he felt the statement so prejudicial, he should have moved for a mistrial; instead, counsel for appellants was willing to permit the jury to consider the case and only after appellants have received an unfavorable verdict and judgment is this error urged as a basis for reversal and a new trial. We feel under the circumstances appellants waived the objection and cannot now be heard to complain[.]

The recent Louisiana Supreme Court decision in *Logan v. Schwab*, 15-1508 (La. 5/27/16), _____ So.3d _____, is instructive on this issue. The majority per

curiam opinion granted plaintiff a new trial because of a "miscarriage of justice" caused by the outrageous behavior of the trial judge as described in detail by Chief Justice Johnson in her concurrence. The majority stated "Considering the unique and narrow facts presented, we conclude a new trial must be granted." Three justices dissented. The dissents pointed out that the behavior of the trial judge, however outrageous, had not been properly documented in the record and no contemporaneous objection was made as to the judge's behavior during the trial:

> This examination required by law must be based on evidence, not conjecture, and begins with the trial record. In the trial record, there is nothing to substantiate the plaintiffs' allegations of inappropriate behavior. Most significantly, there is not even an objection in the trial record for any of the allegations leveled against the judge. This court has previously found that the lack of a contemporaneous objection about a judge's conduct reveals a lack of prejudice.
>
> . . . .
>
> However, the law also contains the counsel of great care and caution in resorting to a juror's impressions. Specifically and directly, [La.Code Evid.] art. 606(B) limits a juror's testimony to "whether any outside influence was improperly brought to bear upon any juror" and prohibits testimony as to the "effect of anything upon his or any other juror's mind or emotions as influencing him" or "concerning his mental processes" as to reaching a verdict.
>
> . . . .
>
> As this court previously recognized, there are two rationales behind the contemporaneous objection rule: "(1) to put the trial judge on notice of the alleged irregularity so that he may cure the problem and (2) to prevent a defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by objection." *State v. Thomas*, 427 So.2d 428, 433 (La.1982) (on reh'g). **A party should not be entitled to stash an objection in his back pocket and sit on it, only to pull it out after an adverse judgment.**

*Id.* at pp. 2-3 (emphasis added). Though contained in the dissents, the points of law at issue accurately quote settled jurisprudence.

In *Mitchell v. Diamond Offshore Drilling, Inc.*, 05-396, pp. 9-10 (La.App. 3 Cir. 11/2/05), 916 So.2d 465, 472, our court stated, "Even assuming the trial judge may have committed a 'borderline' error in commenting upon the testimony in the manner in which he did, upon our review of the record, we find the comments did not deny the jury adequate and meaningful deliberations or deprive [defendant] of a fair trial."

The supreme court, in a recent decision authored by Justice Knoll dealing with the manifest error rule had this to say about the duty of a reviewing court when considering whether to overturn a jury verdict: "The issue to be resolved on review is not whether the judge or jury was right or wrong, but whether the judge's or jury's factfinding conclusion was a reasonable one." *Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC*, 14-2592, p. 4 (La. 12/8/15), ___ So.3d ___. Further, the court stated:

> Rather in reversing a trial court's factual conclusions with regard to causation, the appellate court must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong. *Stobart v. State through Dept. of Transp. and Development*, 617 So.2d 880, 882 (La. 1993).
>
> This test requires a reviewing court to do more than simply review the record for some evidence, which supports or controverts the trial court's findings. The court must review the entire record to determine whether the trial court's finding was clearly wrong or manifestly erroneous. *Parish Nat. Bank v. Ott*, 02-1562, pp. 7-8 (La. 2/25/03), 841 So.2d 749, 753-54. The issue to be resolved on review is not whether the judge or jury was right or wrong, but whether the judge's or jury's factfinding conclusion was a reasonable one. *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989); *Canter v. Koehring Co.*, 283 So.2d 716, 724 (La.1973).
>
> Notably, reasonable persons frequently can and do disagree regarding causation in particular cases. But where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Rosell*, 549 So.2d at 844.

*Id.* at pp. 4-5.

In reviewing the jury's verdict and deciding whether to grant a new trial, the trial judge in this case had an even greater standard. He is not to overturn the jury's verdict when **any** fair interpretation of the evidence would support it.

In this case, the only grounds for the motion for new trial was the claim that the trial judge, in response to a jury question, and after consulting with all the attorneys, mistakenly gave inaccurate information to the jury about the effective date of an owner's manual for the steering system in question. In effect, the allegation is that because the trial judge, without objection, and in fact, by agreement of all counsel, inaccurately commented upon or added to the evidence already in the record in violation of the prohibition against a judge commenting upon or attempting to recapitulate the evidence in a jury trial contrary to La.Code Civ.P. art. 1791,[2] there was a "miscarriage of justice" under the discretionary grounds of La.Code Civ.P. art. 1973 such that a new trial should be ordered.

The record shows the following occurred:[3]

(Whereupon the jury returns to the courtroom.)

THE COURT:

You asked two things. You asked for photographs. We're going to send you with two photographs. Okay? And you said manuals. We didn't know which ones you wanted, or you wanted all

---

[2]Louisiana Code of Civil Procedure Article 1791 provides: "The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted."

[3]The exhibits mentioned throughout this opinion will be identified as follows:

P-2 Photo of Boat Pump
P-5 Photo of Cylinder Warning
P-22 Warning Sign (Cylinder)
P-23 Warning Sign (Pump)
P-24 SeaStar Manual for Outboard

three:

JURY FOREMAN:

The copy of the two - - or the manuals that came with the - -

THE COURT:

I got a manual on SeaStar, a manual the Champion boat, and a manual on the OMC motor.

JUROR:

We want the manual for the helm cylinder, that - - the steering one.

THE COURT:

SeaStar.

JUROR:

Yeah.

THE COURT:

Okay.

JURY FOREMAN:

And the pictures of it too.

THE COURT:

Got it. This is **"P-5".** That's what you wanted? And **"P-2".**

Okay. The bailiff will bring it back to you in the courtroom (sic).

THE CLERK:

**"P-24."**

THE COURT:

"**P-24"** is the one they've got, the SeaStar manual.

(Whereupon the jury exists the courtroom to deliberate.)

(Whereupon the jury returns to the courtroom.)

THE COURT:

Okay. My appreciation of the question is; "Is this the '97 SeaStar manual that would have been in the boat available in 1998?" That's my understanding of that.

Were you looking at this to give you the 2006?

The back of it says was revised in 2006.

JURY FOREMAN:

The back of it says was revised in 2006.

THE COURT:

I don't see that he's talking about.

(Whereupon the juror approaches to point it out.)

JURY FOREMAN:

It says, "0706 Rev." at the bottom. Or is that maybe just a code, or . . .

THE COURT:

Okay. Come see.

Form number - - it's - - no, that's just a - - that's probably just a code. What they were looking for here - - see, '07, '06.

MR. FROHN:

That's just printer's code of some kind.

THE COURT:

That's not a revision date:

MR. FROHN:

No, that's a - - that's got to be a printer's code - -

THE COURT:

No.  **This is what purports to be the manual that was available, or that was produced in connection with the device that was in the boat.**  Yeah.

(Emphasis added.)

The manual in question, introduced by plaintiff and identified as P-24, was the only steering system manual in evidence.  Arguably, when the question arose, the judge should have simply instructed the jurors that they must rely on their memory of the witness testimony as to the date and relevance of the manual.  Instead, the trial judge called the lawyers to the bench for a bench conference.  The trial record confirms that plaintiff's counsel was at the very depositions at which the experts testified as to when the applicable manuals were printed and when they were revised.  Most importantly, at the moment the jury asked the question and the court answered it **after consulting with both attorneys**, **there was no contemporaneous objection made by plaintiff's counsel** when the judge asked the attorneys what answer to give the jury.  When the judge did answer the question, Teleflex's attorney and the trial judge were wrong about the effective date of the manual, but since that manual was the **only manual** in evidence that pertained to the steering system, the full answer given by the trial judge, as noted above, was factually correct.  This was the manual (the only manual in evidence) that pertained to the steering system, regardless of the date.

Plaintiff's counsel, Mr. Bernard, alleged in the motion for new trial filed with the trial court that co-counsel, Mr. Fazzio, "handled that part of the case," and was not in the courtroom when the jury's question arose.  However, the attorney in question, Mr. Fazzio, stated the following on the record at the motion for new trial:

> When I come in Mr. Dewees (the jury foreman) and other are walking through the door and apparently somebody was focused on

that date stamp.  Mr. Dewees walks to the jury box - - - and he shows the Court what it is he's looking at.  I'm standing back at counsel table and I'm watch this go on and then Mr. Frohn says to the - - to the jury or says in front of the jury, "It's a printer's code."

Though Mr. Fazzio may not have been in court when the jury first came in and asked about the manual, clearly, Mr. Fazzio was in court and able to object before the jury went back in to deliberate.

In this case, it was plaintiff's burden to prove that a new trial was warranted. In that connection, it is especially difficult to discern what effect, if any, the answer to the jury's question may have had on the jury's decision.  Any effort to delve into the minds of the jurors post trial would be prohibited by the Louisiana Code of Evidence.  Indeed, La.Code Evid. art. 606(B) states:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

The record further reflects that immediately after the trial judge answered the jury's question, with no objection from plaintiff's counsel, the judge had second thoughts about whether he was improperly commenting on the evidence and he specifically addressed the attorneys:

THE COURT:

Do you have (any) objection to my response to them.

MR. FROHN:

None whatsoever.

MR. BERNARD:

None for the plaintiff either.

THE COURT:

It came close to commenting on the evidence and telling them what it was, but I got the impression the testimony said that this was the manual that went with the thing; is what the testimony was, right? Okay. (No response.)

(Whereupon the jury exits the courtroom to deliberate.)

Again, plaintiff's counsel did not object while there was still time to correct any perceived error. Mr. Fazzio, the attorney who handled the questioning of Mr. Killingsworth and all of the experts as to the manual, was at counsel table. At that point, had there been an objection, the judge could have simply instructed the jurors to rely on their memories and judgment as to what plaintiff's own exhibit meant and whether the effective date of that "manual revision" was relevant.

The very notion that the trial judge informing the jury by agreement of all counsel that the wrong revision date on plaintiff's own exhibit can then be used to establish a "miscarriage of justice" warranting a new trial is especially contradicted where, as here, the testimony at trial was that neither the boat owner or operator had ever received or read **any** manual on the hydraulic steering system. Plaintiff's own expert, Stephen Killingsworth said of the relevance of the manual:

Q. You talked about this manual - - well, let's start kind of backwards here. The manual that we now have into evidence, just to be sure of what it is entitled, it is entitled not only installation instructions, but it is an owner's manual, correct?

A. That's correct.

Q. And you've been around this case long enough to know that this [P-24] is the manual that the Vamvoras family did not get when they bought the boat?

A. That's what I understood.

Q. Okay. So, for all your quarreling with the manual, it doesn't matter because they didn't have it to read anyway.

A. I don't know if that's a question.

Q. I'm sorry. Isn't it true that they didn't have it in the first instance to even refer to if they so chose?

A. That's correct. But the manual - - when I take on a task and look at this I look at – they may not have had access to it, but I look at the population, and it's been discussed by Mr. Fetchko in regard to it, we've got to take into account the entire population. The entire population would have been using that - - that purchased the helm and the other information.

Q. Well, this is not a - -

A. Well, I know. What I'm saying is that I'm not just singling out Mr. Vamvoras. I'm simply saying, as a writer of manuals, writer of warning, as a designer, I would have expected that information to be there, period.

Q. **Okay. But isn't it logical that, no matter how much you quarrel with the manual, if the person who is supposed to get it didn't get it, it's sort of immaterial to a particular case?**

A. **That I'll agree to.**

(Emphasis added.)

The adequacy of the warnings in the Teleflex manual was never at issue. In *Bloxom v. Bloxom*, 512 So.2d 839, 850-51 (La.1987),[4] the Louisiana Supreme Court had this to say about adequate warnings in an owner's manual, "Accordingly, even if an adequate warning of the particular danger in this case had been given by a proper provision in the manual, such a warning would have been futile because Lonnie Bloxom did not read the manual before parking his car over combustible materials."

In fact, during this trial counsel for plaintiff attempted to question Mr. Glen Vamvoras about warnings in general, which would include any warnings that may have appeared in the Teleflex steering system manual.

> Q.  All right.  Let's suppose you had had a warning that said, "Be careful of leaks, because the leak can put the system in trouble." Would you have let your son take the boat if Derek had told you he saw leaking?

> MR. FROHN:

> Your Honor, I object to the question that it's now been established he did not receive a manual, he did not receive any --

> THE COURT:

> Objection.  Sustained.

The trial judge recognized that warnings in the manual were irrelevant and quickly sustained the objection.

In a motion for new trial, the burden remains on the mover.  Here, there was no evidence introduced at the new trial motion as to how the erroneous answer to the jury's question may have possibly influenced the jury's verdict, much less proof of a "miscarriage of justice."  No affidavits, no testimony from an expert or even from plaintiff's counsel – NOTHING!  There definitely was no showing of a "miscarriage of justice."

Assuming arguendo that the trial judge had the authority to grant a new trial in the absence of a contemporaneous objection during trial, an assumption with which I strongly disagree, did the trial judge in this case examine the entire record as required by *Lamb* and its progeny before overturning this jury's decision and granting a new trial?  For whatever reason, the record shows that the trial judge did

---

[4]*Bloxom v. Bloxom*, 512 So.2d 839, 850-51 (La.1987) has been superseded by statute on

not examine the entire record to determine whether the supposed "erroneous" answer to the jury's question caused a "miscarriage of justice." Instead, the trial judge seemed to attempt to shoulder most of the blame. He focused on only one issue, the so-called "erroneous" answer on the effective date of an owner's manual for the steering system, that, admittedly, the owner, Glen Vamvoras, and the operator, Glen's son, Daniel, had never seen or read. It bears repeating that the plaintiff's own expert, Mr. Killingsworth, did not opine that the warning in the manual was lacking. To the contrary, he testified that a manual warning **was not relevant because the owner and the operator had never seen the manual.**

> **Q.     Okay.  But isn't it logical that, no matter how much you quarrel with the manual, if the person who is supposed to get it didn't get it, it's sort of immaterial to a particular case?**
>
> **A.     That I'll agree to.**

(Emphasis added.)

His was the only testimony that defendant was obligated to post a separate warning near the steering wheel and on the helm cylinder. It was that "failure to warn" that Mr. Killingsworth said was in "gross violation of the standard of care" and was "reckless" behavior.

In this case, the trial judge focused only on the trial court's answer to the jury's question about the effective date of plaintiff's exhibit 24, the manual. There was no "careful" review, **or any** review, of the trial record by the trial court. Nor did the majority review all of the evidence in the record to determine whether "the trial court abused its discretion in deciding that the jury verdict was not supportable by 'any fair interpretation of the evidence.'" *Campbell*, 870 2d at 971. The majority quoted only the trial judge's self- blame for giving the jury the "wrong

---

other grounds by *Payne v. Gardner*, 10-2627 (La. 2/18/11), 56 So.3d 229.

answer" about the effective date of the manual.

A full examination of the record amply demonstrates that the "manual issue" was not the basis for the plaintiff's claim. First of all, to repeat, only **one** manual was introduced in evidence, P-24 by **plaintiff**. Hypothetically, if there was an alleged insufficient warning in that manual, it could have had no effect on the jury's ultimate decision, as both the owner and the operator never received or read the manual in question. *See Bloxom*, 512 So.2d 839. Plaintiff's entire case against Teleflex was based on the failure to post a conspicuous warning within easy eyesight of the boat operator, or design an audible warning the operator could hear. The only witness who testified that such a warning should have been posted was plaintiff's expert, Stephen Killingsworth.

In opening and closing arguments, plaintiff's counsel focused on the failure to post a visible warning as recommended by Mr. Killingsworth as the basis for its "failure to warn" products liability claim against Teleflex. No mention whatsoever was made of the adequacy or inadequacy of any "warnings," or lack thereof in the Teleflex Steering System Manual.

In this case, it is clear that someone replaced the original Teleflex manufactured port hose on the hydraulic steering system. It was established by the expert testimony from Mr. Augusto "Kiko" Villalon, the experienced expert hired by the Coast Guard to investigate the accident, that the port hose at the point of connection to the helm cylinder on the hydraulic steering system had been changed, and that a non-Teleflex hose and nut had been used to replace it. That "aftermarket" hose and nut was leaking hydraulic fluid at the connection with the helm cylinder. He opined that someone (whom we now know by his late admission to be Daniel Vamvoras) had attempted to tighten the nut at that

connection with vice grip pliers in a failed attempt to stop the leak of hydraulic fluid. Photographs show the hydraulic fluid leak occurred in the non-Teleflex hose and nut. The component which leaked hydraulic fluid, ultimately leading to a loss of steering, was not a Teleflex product.

Plaintiff's counsel spent a great deal of time trying to challenge Mr. "Kiko" Villalon's credibility by implying that he had done considerable prior work for Teleflex. However, his actual findings were uncontradicted and corroborated by the video of the leaks,[5] as well as by all the pictures in evidence, including plaintiff's exhibits P-2 and P-5, which the jury had specifically asked to see.

Mr. Killingsworth, plaintiff's expert, did not challenge the testimony of how the leak originated and its eventual effect on the boat steering. Nor did the plaintiff allege or argue otherwise. Their point, as testified to by Mr. Killingsworth, was that Teleflex should have displayed a prominent warning that a hydraulic fluid leak of a small amount of fluid could result in a total loss of steering with the possibility of a violet j-turn that could result in property damage, ejection of occupants and serious personal injury or death. Plaintiffs were even allowed to introduce into evidence the exact warnings that Mr. Killingsworth recommended: "WARNING: PARTIAL HYDRAULIC FLUID LOSS can cause total loss of steering, a sudden spin, ejection of occupants, and in injury or death!!!!" Teleflex did install new warnings after the accident, which the trial judge also admitted into evidence in a questionable ruling as the new warnings were clearly "subsequent remedial measures." Those warnings are depicted on P-22 and P-23 and were shown to the jury.

---

[5] Teleflex 3.3 – DVD Villalon Video.

Plaintiff's counsel did an exceptional job of attempting to prove the case, but the jury heard all of Mr. Killingworth's testimony and obviously rejected his theory that failure to post a visible warning by Teleflex or design an audible warning, was a cause of the accident. Again, credibility calls and the duty to weigh the evidence, find the facts and assign fault is within the unique province of the jury.

This jury also heard the testimony of Eric Fetchko, the engineer at Teleflex who had designed and patented the hydraulic steering system, who testified at length at the trial. He was clear that the system had been tested and retested and was much safer than the prior cable system used to steer recreational vessels of this type. This was "power steering" for boats. The system had been in use fifteen years with no prior complaints of a total failure such as this. Mr. Fetchko was adamant that any operator of this vessel would immediately notice and feel a tactile change in the steering of the vessel should there be "air in the system" due to a hydraulic fluid leak. Such a leak would make the steering feel "spongy" or "mushy." The operator may also hear a distinct "clicking sound" as he turned the steering wheel, and more rotations of the wheel would be required to execute a turn. Those signs, that could easily be seen, heard, and felt, would be sufficient to warn any prudent boat operator that something was wrong with the steering such that it should be brought to a qualified mechanic to check it out. If such signs were present, as they clearly were in this case, under no circumstances should an operator run the vessel on plane at high speed.

Mr. Walter Laird, Teleflex's expert, went into great detail in describing that there was supposed to be an "O-ring" seal that would be present in a Teleflex hose that would prevent leaks in the hydraulic steering system. He concluded that either

the O-ring in this aftermarket hose was leaking or absent, and that was the cause of the hydraulic fluid leak and the eventual cause of the steering failure which caused this tragedy.

Mr. Laird even set up a demonstration for the jury to see how the steering would be affected if there was such a leak. He reiterated that if the fluid leaked, air would enter the system and would cause pronounced "clicking." The vessel operator would feel a "bumpy" or "mushy" feeling and, as time went on, it would take more turns of the steering wheel to turn the boat. This would happen gradually and any boat operator would immediately be able to feel the difference in steering. Contrary to what would happen in a cable system where, if a steering cable broke, there would be no warning before a complete loss of steering, the Teleflex system would not suddenly fail without warning. The tactile sensation, "clicking" and "spongy feeling," "bumpiness," or "mushy feeling" could immediately be felt and would gradually get worse over time if the system continued to leak hydraulic fluid.

Testimony and records from both marinas that performed general maintenance on this boat was that no one had done work on the hydraulic steering system, and both were dismissed from this case after extensive attempts during pre-trial discovery produced no records of work on the hydraulic steering system. Someone obviously changed that hose and the nut at that leaking port hose connection.

Mr. Glen Vamvoras testified that a few months before this accident, he and a friend, Mr. Ronnie Gibbs, were fishing and Mr. Gibbs told him the steering "felt different." They discussed adding hydraulic fluid to the steering system. Mr. Vamvoras claimed that Mr. Gibbs called another person, Mr. "Buck" Fellows, who

told them where to add hydraulic fluid. Mr. Vamvoras went to Wal-Mart, purchased the fluid, and added it himself without consulting a hydraulic steering system mechanic located near his home. There is conflicting evidence that he may have added even more hydraulic fluid just two months before this tragedy. The jury could have easily concluded that Glen Vamvoras knew or should have known that there was a leak in the hydraulic steering system and problems with the steering. The pictures in evidence and the video tell the tale!

The LDWF agent, Sgt. Liles, and "Kiko" Villalon confirmed that there was evidence of poor maintenance and a visible leak at the non-Teleflex hose connection, and a video shown to the jury depicted the leak.

Mr. Glen Vamvoras certainly knew that there were qualified boat mechanics located just a short distance from his home as he had used two of them for general maintenance. Still, he decided that in order to correct a steering problem with his boat, he would use "self-help" and added the hydraulic fluid he purchased from Wal-Mart. He denied replacing the hose. Obviously, the jury could have made a decision based on all the evidence and determined that Mr. Vamvoras or his friend, or someone had improperly replaced the Teleflex hose with an after-market hose. Mr. Vamvoras admittedly added hydraulic fluid to the steering system without proper training. He certainly did not "stop the leak" in the hydraulic steering system, as the photos and video in evidence so clearly show.

On the very day of this tragedy, Mr. Glen Vamvoras told Captain Buatt, one of the investigators for LDWF, that he noticed something was wrong with the steering and that he heard a "clicking noise." He initially denied knowing of a hydraulic fluid leak. He said that no one else worked on the boat other than the two marinas and he and Daniel.

Daniel Vamvoras at first denied to the LDWF investigators that he had tried to fix the hydraulic steering system leak by tightening a nut at the port hose connection with vice grip pliers on the day of the accident. He also denied telling his friend, Blaine Teter, that he noticed steering problems with the boat on the morning of the accident as he drove the boat to and from the fuel dock near his house, and as he was pulling someone behind the boat on an inner tube earlier that day.

The pictures introduced in evidence clearly showed that the vise grips were in the boat and had been used to tighten the nut on the non-Teleflex hose to try and stop a hydraulic fluid leak. The photos and a video of the leak introduced in evidence told the story. Though both Daniel and his father, Glen, at first outright denied to the LDWF agents that either of them knew of a steering problem or a fluid leak, Daniel eventually admitted that he was aware of the leak and Glen was questioned about a conflicting statement he made to the LDWF investigator, Captain Buatt, shortly after the accident about his knowledge of prior steering problems.

LDWF agent Sgt. Liles testified at trial that Daniel eventually admitted that he had, in fact, attempted to "fix the leak by tightening the nut" on the day of the accident. At trial, Daniel continued to deny that he noticed anything wrong with the steering, but did admit he heard a "clicking sound." He said his father, Glen Vamvoras, had used the boat only days prior.

Glen Vamvoras testified that as he was putting up political signs for his D.A.'s campaign just three days prior to the accident, he noticed an unusual "clicking" sound in the steering, but did nothing to have it checked before allowing Daniel to take on six passengers three days later to party on "Contraband Days."

He claimed he did not notice what the photos the jury saw and what the video introduced at trial clearly demonstrated was an obvious leak, and he continued to deny any problems with the steering.

Again, expert testimony from Mr. Fetchko and Mr. Laird at trial established that the "clicking sound" was caused by too much air in the system which indicated a loss of hydraulic fluid which would cause very noticeable, tangible problems with the steering. The boat operator would feel a "mushiness" or "spongy feeling" and would have to turn the wheel more to control the steering. The operator would hear "clicking." This "tactile sensation" and "clicking" was the "warning" that something was wrong with the steering and those signs would get more pronounced as more fluid was lost.

The jury was faced with a credibility determination and could easily have rejected the testimony of Daniel and his father as to their knowledge of steering problems and attempts to "fix" those problems before this accident and concluded that Teleflex was not liable for "failure to post visible warnings."

Indeed, the first question the jury asked during deliberations was:

> You had two questions: Are we making any judgments on Vamvoras or Bowtie?

JURY FOREMAN:

> Right.

THE COURT:

> This answer is, no. Okay?
>
> And then you second question: Are – I think it reads, "Or are they released from any responsibility."

JURY FOREMAN:

> Yeah. We didn't know if they were released from just the

courtroom, from questioning or just released from this.

THE COURT

I made a decision that they're relieved from any responsibility. Okay? So you're just to make a determination insofar as - - I lost my head, Teleflex - - Teleflex is concerned.

Okay, you can go back. Thanks you, folks.

(Whereupon, the jury exits the courtroom to deliberate.)

This writer is not suggesting that Glen Vamvoras intentionally lied or tried to deceive the court or jury. However, it is undisputed that at the time of these events, Mr. Vamvoras was distracted as he was engaged in a hotly contested D.A.'s race. Faced with a lawsuit against him and his son after this terrible tragedy, he and his son, like most humans, may have had a tendency to minimize their involvement or rationalize their decisions. The jury had full opportunity to see and hear Mr. Vamvoras and Daniel, as well as all the other witnesses. They also saw all the pictures and the video.

Daniel explained his decision to load his friends in a boat when the steering was "clicking" and when he knew there was a hydraulic fluid leak. It was Contraband Days, a big party on the river. There were fourteen of his friends there and they needed two boats. Though both Daniel and his father testified that had they realized a small loss of hydraulic fluid could eventually lead to a complete loss of steering, Glen would not have permitted Daniel to take the boat out and Daniel would not have done so.

The trial judge and majority focused on the lack of "ease of association" between loss of hydraulic fluid and **complete** loss of steering. The plaintiff's case was based solely on the claim that since neither realized the risk, a "visible warning" could have alerted them.

Such a conclusion assumes that the jury found their testimony that they did not notice problems with the steering and an obvious leak of hydraulic fluid credible. Most importantly, though both Daniel and his father were not experienced **boat mechanics**, they were experienced **boat operators** of recreational boats in general and this boat in particular. Each was acutely aware that a loss of steering while a vessel was underway at high speed could cause disastrous consequences.

Good judgment and common sense dictates that if the boat is having steering problems, you don't load seven people in the boat and operate the boat at high speed on a plane. Both Daniel and his father had operated this particular boat for over six years (purchased in 1999, accident in 2005). Both were experienced operators of recreational vessels and had enough experience with this particular boat to know, and indeed they admitted, that if there were steering problems, it was unsafe to operate the vessel at high speed on plane. Sgt. Liles, the LDWF agent, confirmed at trial that even though he didn't know that a loss of a small amount of hydraulic fluid could result in a complete loss of steering control, he testified that if he "felt" or "experienced" a problem with the steering, he would take the boat to the shop. The first jury verdict in favor of Teleflex was and is fully supported by the law and evidence and should be reinstated.

**CONCLUSION**

To paraphrase Shakespeare, A Miscarriage of Justice "should be made of sterner stuff."[6] The only "miscarriage of justice" here was the trial judge's failure to recognize that there was no objection to his answer to the jury's question as to

the effective date of the only manual in evidence. No contemporaneous objection, no new trial!

After carefully reviewing the entire record in this case, it is clear that the trial judge abused his discretion in granting a new trial. He did not apply the contemporaneous objection rule. He did not review **all** of the evidence and make a fact based determination that the jury verdict was not supportable by "any fair interpretation of the evidence" pursuant to the mandates of our jurisprudence. Likewise, the majority did not apply the contemporaneous objection rule and focused on the trial judge's self-admitted "error" in answering the jury's question about the effective date of a hydraulic steering owner's manual that neither the owner nor operator had seen and that plaintiff's expert had opined was not relevant. The majority did not articulate, based on a review of all of the evidence in the record, how it determined the jury's verdict was not supportable by "any fair interpretation of the evidence" before affirming the trial court's decision to vacate this jury's verdict.

Most importantly, the trial judge overturned a jury's verdict whose job it was to evaluate credibility and assign fault. After comprehensive study of the applicable law and careful review of all the evidence, I would reverse the decision of the trial court to grant a new trial and render judgment reinstating the verdict of the first jury and reinstating the original judgment of the trial court dated September 30, 2014 dismissing plaintiff, Ron Warren's, claims, with prejudice, at his cost.

---

[6]Julius Caesar "Ambition should be made of sterner stuff." (Act 3, Scene 2).